## BERGMAN v. DE SIEYES.

District Court, S. D. New York.
Dec. 30, 1946.

Katz & Sommerich, of New York City (Henry I. Fillman and Benjamin Busch, both of New York City, of counsel), for plaintiff.

Donovan, Leisure, Newton, Lumbard & Irvine, of New York City (Theodore S. Hope, Jr., of New York City, of counsel), for defendant.

CAFFEY, District Judge.

On motion by plaintiff to strike out the first complete defense in defendant's answer on the ground that it is insufficient in law.

This defense alleges that, at all times mentioned in the complaint, defendant was a citizen of the Republic of France; that, at the time of the commencement of the action and also at the time of the service on him of the summons and complaint, he was the duly appointed, acting and accredited Minister of the Republic of France to the Republic of Bolivia; and that the service of the summons and complaint on him was effected in the city of New York at a time when he was temporarily present in the City en route from France to his post in Bolivia and while he was awaiting transportation to his post.

The question presented for decision is whether a diplomatic minister en route to his post in the country to which he is accredited is immune from service of civil process in a third country through which he is passing on the way to his post.

Plaintiff's contention is that, since defendant was not a minister or diplomatic agent accredited to the United States but was, instead, a diplomatic agent accredited to the Republic of Bolivia and was merely passing through New York on his way to Bolivia, and since the summons and com-

plaint did not prevent him from discharging his diplomatic functions by restraint on his personal liberty, he is not entitled to any immunity from service of civil process under Section 252, Title 22, U.S. C. Annotated, which, plaintiff admits, is merely declaratory of the common law, of which the law of nations is a part. This Section provides:

"Whenever any writ or process is sued out or prosecuted by any person in any court of the United States, or of a State, or by any judge or justice, whereby the person of any ambassador or public minister of any foreign prince or State, authorized and received as such by the President, * * * is arrested or imprisoned, or his goods or chattels are distrained, seized, or attached, such writ or process shall be deemed void."

This Section was first enacted on April 30, 1790, ch. 9, Section 25, 1 Stat. 117, and unchanged in language, has continued ever since. In Ex parte Baiz, 135 U.S. 403, 420, 10 S.Ct. 854, 858, 34 L.Ed. 222, the court said that this Act was "drawn from the statute 7 Anne, ch. 12, which was declaratory simply of the law of nations, which, Lord Mansfield observed in Heathfield v. Chilton, 4 Burr. 2016, the act did not intend to alter and could not alter."

It is obvious that Section 252 has no application to the case at bar. It does not purport to deal with the situation here, for the defendant was not received by the President as such minister.

So far as has been discovered, all the reported cases, both in this country and in England, recognize that both these acts are merely declaratory of the Law of Nations. But it is plain that they do not attempt to cover the entire field of diplomatic immunities and privileges under the Law of Nations.

The inquiry must, therefore, be directed to an examination of what immunities and privileges are accorded to diplomats under the Law of Nations and under what conditions and circumstances.

It seems to be universally recognized that a diplomatic minister is immune from bodily restraint, i. e., arrest or imprisonment, in the country to which he is accredited. And, in 1859, it was decided by the Queen's Bench, in Magdalena Steam Navigation Co. v. Martin, 2 El. & El. 94, 111, 112, 114-116 (28 L.J.Q.B. 310, 121 Eng.Rep. 36, 43, 44), that a foreign minister accredited to England was immune from service of process in an action brought to enforce a civil liability and could not be compelled to answer. In sustaining defendant's plea Lord Chief Justice Campbell said this:

" * * * The great principle is to be found in Grotius de Jure Belli et Pacis, lib. 2, c. 8, s. 9, 'Omnia coactio abesse a legato debet.' He is to be left at liberty to devote himself body and soul to the business of his embassy. He does not owe even a temporary allegiance to the Sovereign to whom he is accredited, and he has at least as great privileges from suits as the Sovereign whom he represents. * * * For these reasons, the rule laid down by all jurists of authority who have written upon the subject is, that an ambassador is exempt from the jurisdiction of the Courts of the country in which he resides as ambassador" (pp. 111, 112).

" * * * It is allowed that he would not be bound to answer interrogatories, or to obey a subpoena requiring him to be examined as a witness for the plaintiffs. But he must defend the action, which may be for a debt of 100,000£, or for a libel, or to recover damages for some gross fraud imputed to him. He must retain an attorney and counsel, and subpoena witnesses in his defense. The trial may last many days, and his personal attendance may be necessary to instruct his legal advisers. Can all this take place without 'coactio' to the embassador?" (p. 114).

"Reference was frequently made during the argument to stat. 7 Anne, c. 12; but it can be of no service to the plaintiffs. The 1st and 3d sections are only declaratory of the law of nations, in conformity with what we have laid down; * * * but the statute cannot be considered as directed only against bailable process. The writs and processes described in the 3d section are not to be confined to such as directly touch the person or goods of an ambassador, but extend to such as, in their

usual consequences, would have this effect. At any rate, it never was intended by this statute to abridge the immunity which the law of nations gives to ambassadors, that they shall not be impleaded in the Courts of the country to which they are accredited" (pp. 114, 115).

"It certainly has not hitherto been expressly decided that a public minister duly accredited to the Queen by a foreign state is privileged from all liability to be sued here in civil actions; but we think that this follows from well established principles, * * *" (pp. 115, 116).

In Musurus Bey v. Gadban, [1894] 2 Q. B. 352, the Court of Appeal said that the Magdalena case "which has never since been doubted, settled that he could not [be sued while he was still ambassador], as during that period he was exempt from the jurisdiction of the Courts of this country" (p. 354). The court also said at page 356:

" * * * This case renders it unnecessary to report to text-writers, and to other cases prior thereto, for it lays down in clear and unambiguous language the principles upon which an ambassador is free from being impleaded in the Courts of this country."

In New Chile Gold Mining Co. v. Blanco, 4 Times Law Rep. 346, decided by the Queen's Bench Division in 1888, Blanco, the Venezuelan Minister Plenipotentiary to France, had been sued, together with an English resident, in an English Court and had been served in France by substituted service. He applied to have the service set aside on the ground of his diplomatic status. In the exercise of its judicial discretion the court granted the application, holding that it was not right to allow a foreign minister, resident in a foreign country, to be sued in an English court. The court gave no judgment on Blanco's privilege as a diplomat, the two judges appearing to entertain different views on the point. Baron Huddleston said (p. 349):

" * * * that the privilege of ambassadors ought not to be extended beyond ambassadors in our own country, and he should be very loth, as at present advised, to hold that the same privilege was to be extended by our courts to ambassadors in

a foreign country, who may be sufficiently protected by the laws of that country."

Mr. Justice Manisty, however, said at pages 349, 350:

"It appeared to him that the Court ought not to call upon a foreign ambassador in a foreign country to leave his post and come over to this country. It would interfere vastly with the duties he had to discharge. * * * That principle (laid down by Lord Campbell in the Magdelena case) he thought should be adhered to, and it would be violated by compelling a foreign ambassador to a foreign country to appear and defend himself in this Court. Virtually, if summoned, he must appear, and probably in such an action as this he would have to come over to this country, and that would be in reality a coercive process or kind of coactio, which was said by Grotius not to be permissible against ambassadors."

Apparently the foregoing are the principal English cases. The American cases will now be considered.

The earliest decision seems to be Ex Parte Cabrera, 4 Fed.Cas. pp. 964, No. 2278, 1 Wash.C.C. 232, decided in 1805 by Justice Washington in the Circuit Court for Pennsylvania. Cabrera was the Secretary of the Spanish legation in this country. He had been arrested and committed on a criminal charge by the State Court. The court dismissed his writ of habeas corpus for lack of power in the Federal court to release a person charged with a crime by a State court. In passing, the court said (4 Fed.Cas., page 965 left column, supra):

" * * * it is not, and cannot be denied, but that he is under the protection of the law of nations; and is not amenable to the tribunals of this country, upon a civil or criminal charge."

In 1839 the case of Holbrook, Nelson & Co. v. Henderson, 6 N.Y.Super.Ct. 619, 4 Sandf. 619, came before the full bench of the Superior Court of the City of New York. Henderson was the Minister of the Republic of Texas, duly accredited to France and England. He was arrested under civil process while in the City of New York en route from his posts to Texas with a treaty with France to be presented for

ratification to the Congress of Texas. It was contended that the privilege from arrest applied only to public ministers deputed to this country by a foreign State and residing here as such. His application to be discharged was granted, however, in a well considered opinion by Chief Justice Oakley. He said:

" * * * It is clear that this privilege is founded, not on any municipal law of this country, but on the law of nations. The act of Congress of April, 1790, (which is in substance like the English act) cannot be construed as intended to *confer* this privilege. Its object is to enforce it, * * *" (6 N.Y.Super.Ct. page 627).

"I cannot, therefore, yield my assent to the argument, which has been pressed upon us, that the act of Congress has limited the extent to which the privilege of a foreign minister may be enjoyed. I do not suppose that it was intended to abrogate any part of the generally received and acknowledged principles of international law on that subject" (6 N.Y.Super.Ct. page 628).

"Vattel, following out these principles, to what, I think, is their legitimate result, holds that an ambassador, passing through the territory of a friendly power, is entitled to at least some of the rights and privileges of ambassadors. He says that, although the prince to whom the minister is sent, is under a particular obligation that he shall enjoy all the rights annexed to his character, yet others, through whose dominions he passes, are not to deny him those regards to which the minister of a soverign is entitled, and which nations owe to each other. They especially owe him an entire safety. To insult him would be injuring his master, and the whole nation; to arrest him and offer violence to him; would be hurting the right of embassy which belongs to all sovereigns. According to Vattel's opinion, then, the principles of international law on which the rights and privileges of resident ministers rest, apply to a case like the one now before us, so far as to secure to the minister an entire personal safety, and freedom from arrest, and violence, or, in other words, from all restraint of his personal liberty, where-by he may be prevented from discharging his duties to his own soverign.

"This view of Vattel recommends itself very strongly to my judgment. It is founded in good sense and sound reason. It is diffcult to designate any principle among those before stated, as sustaining the rights of a resident minister to be exempted from arrest or a restraint of his personal liberty, which does not apply to the case of one standing in the situation of this defendant" (6 N.Y.Super.Ct. page 629, 630).

"In thus adopting the doctrine of Vattel, I, of course, have not overlooked the fact, that most, perhaps all the other writers on international law, to which we have referred, have advanced different views. The most distinguished amongst them, Grotius and Wicquefort, united in the opinion, that a public minister, passing through the territory of a third power, is not entitled to any privileges as such, and if my decision were to be governed by the mere weight of the opinions of learned men, I should probably arrive at a conclusion different from that which has resulted from my examination of the subject. But, as mere opinions, they do not address themselves to us with the authority of judicial decisions, and are to be regarded only as they seem consonent with sound reason. I am not satisfied with the grounds on which these writers sustain their opinions, or with the cases to which they refer for their support. Those cases cannot be considered, according to any reasonable view of the subject, as amounting to satisfactory evidence of the practice and usage of nations. * * * And after all, the practice of nations at a remote period, and the opinions of the old writers on national law, seem to me to be entitled of themselves to little weight with us. The law of nations, like other systems of law, is progressive. Its principles are expanded and liberalized by the spirit of the age and country in which we live. Cases, as they arise under it, must be brought to the test of enlightened reason and of liberal principles; * * *" (6 N.Y.Super.Ct. pages 631, 632).

In 1889 the case of Wilson v. Blanco, 56 N.Y.Super.Ct. 582, 4 N.Y.S. 714, was decided by the same court upon the opinion

of Judge O'Gorman below. The question arose upon a motion by Blanco to vacate the service of a summons upon him and to vacate a judgment entered against him by default. Blanco was the Envoy Extraordinary and Minister Plenipotentiary, duly accredited, from Venezuela to France and recognized as such by the government of the United States. He as served with the summons while in the City of New York, waiting to take early means of conveyance to France. The motion was made upon the ground that, when so served, he was an ambassador and, as such, not amenable to any civil suit against him in New York City or State. In granting the motion the court said:

" * * * It is conceded, for the purposes of this action, that he could not lawfully have been arrested while thus in the city of New York, and this concession is in accordance with the judgment of this court in Holbrook, [Nelson & Co.] v. Henderson, [6 N.Y.Super.Ct. 620], 4 Sandf. 620. The court there, however, went further, and expressed the opinion that the privilege of an ambassador extended to immunity against all civil suits sought to be instituted against him in the courts of the country to which he was accredited, as well as in those in a friendly country through which he was passing on his way to the scene of his diplomatic labors, and to this privilege the learned court held that he was entitled, as representative of his sovereign, and also because it was necessary for his free and unimpeded exercise of his diplomatic duties. This opinion of the superior court is in accord with that of Wheaton, as set forth in his book on the Law of Nations, in which he has collected and condensed the views of numerous jurists of recognized authority on the subject. Wheat. Hist.Law Nat. 240 et seq. This rule of international law derives support from the legal fiction that an ambassador is not an inhabitant of the country to which he is accredited, but of the country of his origin, and whose sovereign he represents, and within whose territory he, in contemplation of law, always abides."

Carbone v. Carbone, 123 Misc. 656, 206 N.Y.S. 40, was decided in 1924 by Judge Proskauer, sitting in a Special Term of the New York Supreme Court. It was an action for absolute divorce. Defendant moved to set aside the service of the summons upon him and to vacate an order of arrest and discharge the bond which he had given to secure his release. The motion was based on the ground that he was a diplomatic attache of the Republic of Panama, attached to its legation in Italy. In granting the motion to vacate the order of arrest and to discharge the bond, but denying the motion to set aside the service of the summons, the court said at pages 656, 657 of 123 Misc., at page 41 of 206 N.Y.S.:

"He can take no advantage of the provisions of the federal Judicial Code, which apply only to those of diplomatic status accredited to the government of the United States. There are, however, certain immunities accorded by international law and custom. * * * An ambassador, while 'passing through the territory of a friendly power,' is entitled 'to at least some of the rights and privileges of ambassadors' accredited to that country. Holbrook v. Henderson, 6 N.Y.Super.Ct. 619, 629."

Judge Proskauer then referred to Judge Oakley's opinion in the Holbrook case, that the privilege extended to freedom from arrest and to what, as he said, was the erroneous statement in the opinion in Wilson v. Blanco that the court in the Holbrook case had expressed the opinion that the privilege extended to freedom from civil suit, and then said, 123 Misc. at page 657, 206 N.Y.S. at page 41:

" * * * There is a clear distinction between immunity from the service of civil process and immunity from arrest or other interference with personal freedom. The principle of international law which grants an ambassador immunity from suit in the country to which he is accredited rests upon the reason that the ambassador is not to be interfered with or coerced by any of the powers inherent in the sovereignty to which he is accredited. A country through which he is merely passing to or from the country to which he is accredited owes him only the duty not to prevent him from discharging his diplomatic function by restraint on his personal liberty. As stated by Oppenheim (1 Internat.Law [3d Ed.] 574): ' * * * there ought to be no

doubt that such third state must grant the right of innocent passage to the envoy. * * * But other privileges * * * need not be granted to the envoy.'

"The same opinion is expressed by Mr. Baron Huddleston in New Chile Gold Mining Co. v. Blanco, 4 T.L.Rep. 349."

There was also a decision by a French court in 1840, Beyley v. Piedanna et Mauroy, Trib. civ. Seine, Sirey 41, 2.148, which is said in the American Journal of International Law, Vol. 26, No. 2, Section Two, p. 87, to have held "that the law of 13 ventôse, an II, is applied equally to those of diplomatic character, regardless of quality or rank, or whether accredited to France, or crossing France to their posts in another country." It appears that the law of 13 ventôse is similar to the statute of 7 Anne and to Section 252, supra. The person there concerned was an American consul crossing France en route to his post in Genoa.

Consuls, however, are not considered by our courts to be entitled to the immunities and privileges of foreign ministers. Auer v. Costa, D.C.D.Mass., 23 F.Supp. 22, 23.

There are additional modern text writers and other authorities which should be examined.

In his treatise on International Law, published in 1920, 3d Ed., Vol. 1, Section 398, p. 574, Oppenheim says:

"If an envoy travels through the territory of a third state incognito or for his pleasure only, there is no doubt that he cannot claim any special privileges whatever. He is in exactly the same position as any other foreign individual there, although by courtesy he might be treated with particular attention. But matters are different when an envoy, on his way from his own state to the state of his destination, travels through the territory of a third state. Now, as the institution of legation is necessary for the intercourse of States, and is firmly established by International Law, there ought to be no doubt that such third State must grant the right of innocent passage (jus transitus innoxii) to the envoy, provided that it is not at war with the sending or the receiving state. But other privileges,* especially those of inviolability and exterritoriality, need not be granted to the envoy. Moreover, the right of innocent passage does not include the right to stop on the territory longer than is necessary for the passage."

Twiss, to whom Oppenheim refers in his footnote, in his work on the Law of Nations, published in 1884, 2d Ed., Vol. 1, Section 222, says:

"Jurists are divided in opinion upon the question whether an Ambassador is by the Law of Nations entitled of Right to Safe Conduct whilst passing through the territory of a third Power on his way to or from the territory of the Nation to which he is accredited. * * * It must be borne in mind, that many of the Rights now recognized as incident to the Right of Embassy, have only been so recognized, since the practice of accrediting Resident Ambassadors has given occasion for their recognition" (p. 373).

"The Right of Innocent Passage, in regard to an Ambassador on his way to the Court to which he is accredited, is a Right in which all Nations are interested. It may be said of the disputes of Nations as of individuals, 'Rei Publicae interest ut finis sit litium.' It is in the common interests of Nations that the peace of the World should be maintained, and the Personal Inviolability of the Ambassador, whose mission is essentially that of Peace, is as necessary for that end, when he is passing on his way to his destination, as when he has reached his post" (p. 376).

In his work on International Law, 8th Ed., published in 1924, Hall also says at p. 364:

"Possibly the right of a diplomatic agent to innocent passage may carry with it that the sovereign of the country through which he passes ought, as a matter of courtesy,

---

* "The matter, which has always been disputed, is fully discussed by Twiss (The Law of Nations, 2d Ed.), who also quotes the opinion of Grotius, Bynkershoek and Vattel."

The privileges of inviolability and exterritoriality, as referred to by the author, include exemption from both criminal and civil jurisdiction and from subpoena.

to make provision for securing him from the operation of its local laws in petty matters, so that he may not be detained on his journey except by grave causes. More than this it would be difficult at present to claim; and it hardly seems that there is any need to go further in the direction of protecting him from civil or criminal process instituted by private persons."

In his treatise on International Law, 6th Ed., published in 1929, at pages 467-470, Wheaton discussed the conflicting views of Grotius, Bynkershoek, Wicquefort, Vattel and Merlin. There he wrote to this effect:

"The opinion of public jurists appears to be somewhat divided upon the question of the respect and protection to which a public minister is entitled, in passing through the territories of a state other than that to which he is accredited" (p. 467).

"The right of innocent passage is, on the whole, recognized" (p. 469).

In connection with the last statement, Wheaton referred to the case of Soulé, the U. S. Minister at Madrid, who wished to travel to his post via Paris and to whom the French government was prepared to permit mere passage but not a stay in Paris because he was suspect. He added that "Analogous to this is the decision of the Supreme Court of New York" in the case of Wilson v. Blanco.

In Hackworth's Digest of International Law, Vol. 4, Section 400, pp. 513, 514, it said that Secretary of State Elihu Root wrote the Secretary of Commerce and Labor on March 16, 1906, as follows:

"There are many and various reasons why diplomatic agents, whether accredited or not to the United States, should be exempt from the operation of the municipal law at [sic] this country. The first and fundamental reason is the fact that diplomatic agents are universally exempt by well recognized usage incorporated into the common law of nations, and this nation, bound as it is to observe International Law in its municipal as well as its foreign policy, cannot, if it would, vary a law common to all. * * *

"The reason of the immunity of diplomatic agents is clear, namely: that Govern-ments may not be hampered in their foreign relations by the arrest or forcible prevention of the exercise of a duty in the person of a governmental agent or representative. * * *

"It would appear therefore abundantly clear that the immunities of diplomatic agents exist by virtue of the law of nations which is a part of the law of the land, and that such provisions [sections 4062-4065 of the Revised Statutes [22 U.S.C.A. §§ 251-255]] are merely declarative and punitive in their nature."

And the contents of a telegram from Ambassador Dawes ·to Secretary Stimson on November 24, 1930, pp. 538, 539, are given as follows:

"The American Ambassador to Spain was threatened with a libel suit in Great Britain. The Department of State instructed the Embassy in London informally to ask the opinion of the British Foreign Office as to whether the Ambassador would be immune from process issuing from a British court if in England in transit to his post or if in England on business or pleasure while not in transit. The Foreign Office stated that it was clear that, if an attempt were made to sue the Ambassador while in Great Britain, the courts would find no reported case decisive on the point and would have to decide it according to their view of international law and that, in view of the difference of opinion among textbook writers, it was impossible to predict the result."

In the American Journal of International Law, Vol. 26, No. 2, Section Two, published in April, 1932, there is a draft of a Convention on Diplomatic Privileges and Immunities, prepared under the auspices of the League of Nations, Article 15, "Transit through Third State," which provides (p. 85):

"When a member of a mission, a member of his family, or a member of the administrative personnel is en route to or from his post in the receiving state, a third state shall permit his transit and shall accord to him during the transit such privileges and immunities as are necessary to facilitate his transit; provided that the third state has recognized the government of the sending

state and is notified of the official character of such person."

Again in the Comment on this Article, it is said:

"Authorities are in disagreement concerning the duty of a state toward another state, as to the immunities of the latter's diplomatic mission while in transit through its territory to a receiving state. Some admit no legal duty and leave the whole matter as one of comity. Others make the duty equivalent to that of the receiving state" (p. 85).

"The present article is based upon the theory that freedom for the carrying on of international relations through the instrumentality of diplomatic agents is a common interest of all of the members of the international community. It recognizes the duty of a state to allow transit over its territory of diplomatic missions of foreign states en route to or from their posts, granting to them such immunities as are necessary to secure and facilitate their unimpeded transit. This duty, however, is limited to those states and governments by which the state is recognized and with which it is at peace" (p. 88).

The Sixth International Conference of American States at Havana, on February 20, 1928, adopted the Pan-American Convention on Diplomatic Officers (Report of the Delegates of the United States of America to the Sixth International Conference of American States, Washington, 1928, Appendix 11). This Convention has been ratified by several of the States who sent delegates to the Conference but does not appear to have been ratified as yet by the United States. So far as the United States is concerned, it, of course, lacks the force of law, but it is important as being the first formal pronouncement by sovereign States of the Law of Nations in this regard. Sections 19 and 23 of the Convention provide:

"19. Diplomatic officers are exempt from all civil or criminal jurisdiction of the State to which they are accredited."

"23. Persons belonging to the mission (diplomatic officers) shall also enjoy the same immunities and prerogatives in the States which they cross to arrive at their posts or to return to their own country."

The foregoing seem to be the principal sources to which one must look in his endeavor to ascertain the Law of Nations, as it stands today, with reference to the question here involved. The Magdalena and Holbrook cases are especially important, for they contain very full and well reasoned discussions of the immunities and privileges of foreign ministers and the reasons for their existence.

The conclusions to be drawn from these authorities impress one as being (1) that a foreign minister is immune from the jurisdiction, both criminal and civil, of the courts in the country to which he is accredited, on the grounds that he is the representative, the alter ego, of his sovereign who is, of course, entitled to such immunity, and that subjection to the jurisdiction of the courts would interfere with the performance of his duties as such minister; and (2) that a foreign minister en route, either to or from his post in another country, is entitled to innocent passage through a third country and is also entitled, on the same grounds, whether as a matter of right or of discretion, to the same immunity from the jurisdiction of the courts of the third country that he would have if he were resident therein.

Can it be denied that General Blanco, the Venezuelan Minister to France, sued both in New York and in England, would have been seriously hampered in the performance of his duties in France, if he had been compelled to answer and defend those suits? The same thing is true as to the defendant here. Undoubtedly there is conflict in the decisions of the New York courts, but I think the decision in the Carbone case, even though more recent in point of time, should not prevail over the better considered Holbrook case. The Carbone case is the opinion of only one judge, as against the opinions of six judges who sat in the Holbrook and Wilson cases.

Accordingly, the plaintiff's motion to strike the first complete defense will be denied. Settle order on two day's notice.