**HELLENIC LINES, LIMITED, Appellant,**

v.

**Luke C. MOORE, United States Marshal for the District of Columbia, Appellee.**

**No. 18265.**

United States Court of Appeals District of Columbia Circuit.

Argued April 20, 1964.

Decided March 25, 1965.

Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and WASHINGTON, Circuit Judge.

BAZELON, Chief Judge:

Appellant filed a libel *in personam* against the Republic of Tunisia. D.D.C. Admiralty No. 27–62. A summons was issued addressed to the Republic to be served upon the Tunisian Ambassador to the United States. Appellee, the United States Marshal, made the following return upon the unexecuted summons: "The within named principal agent having Diplomatic Immunity and being listed in the Diplomatic List of the State Department cannot be served at Washington, D. C. * * *" Appellant then filed this mandamus action to compel appellee to serve the summons "in conformity with the dignity and respect to be accorded representatives of a foreign government." The court granted appellee's motion to dismiss.

The only issue is whether the Marshal's return provided an adequate reason for his refusal to serve the summons. The return indicated that the Ambassador was entitled to diplomatic immunity. If the Ambassador's diplomatic immunity would in fact have been violated by service of process, the Marshal's return was sufficient. For although courts will not allow a Marshal to avoid his duty to serve process merely because he notices the availability of a defense to the suit,[1] they must protect him if service would violate international law and might subject him to the criminal law of the United States.[2] Since we

Mr. Charles F. Warren, Washington, D. C., for appellant.

Mr. Bruno A. Ristau, Attorney, Department of Justice, with whom Asst. Atty. Gen. John W. Douglas, Messrs. David C. Acheson, U. S. Atty., and Morton Hollander, Attorney, Department of Justice, were on the brief, for appellee.

---

1. The Marshal would not be permitted to refuse service because, for example, he notices that venue is improper, since the defendant might not wish to raise the defense. The defendant might decide that, although venue were improper, defense of the suit in the proper venue would be less convenient or would under 8rie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, 114 A.L.R. 1487 (1938), require the application of less desirable law. Similarly, a sovereign sued in the United States might waive its immunity defense because it could more easily present its witnesses and evidence here or because the law would be more favorable here than in courts of alternative forums where it would have no immunity defense. The sovereign might also decide that an airing of the dispute in an independent judicial tribunal would further its domestic policies or its foreign relations.

2. Statutes passed in 1790 make it criminal for any officer to execute any process "whereby the person of any ambassador * * * of any foreign * * * State * * * is arrested or imprisoned, or his

think that the Ambassador's diplomatic immunity would have been violated by any compulsory service of process on him by the Marshal,[3] we conclude that the return was sufficient, and the district court's dismissal was proper.

**▉** Although we have held that diplomatic immunity is violated by joining a diplomatic officer as a defendant to a suit, Carrera v. Carrera, 84 U.S.App. D.C. 333, 174 F.2d 496 (1949), we have never decided whether it is violated by service of process on a diplomatic officer in an attempt to join, not him, but his sending state. There is little authority in international law concerning whether service of process on a diplomatic officer as an agent of his sending country is an "attack on his person, freedom or dignity" prohibited by diplomatic immunity.[4] Because application of the doctrine of diplomatic immunity exempts a person

from the legal procedures necessary to ordered society and often deprives others of remedies for harm they have suffered, courts hesitate to invoke the doctrine in a novel situation unless its purposes will certainly be served. These purposes are to "contribute to the development of friendly relations among nations" and "to ensure the efficient performance of the functions of diplomatic missions." Vienna Convention on Diplomatic Relations Signed at Vienna, April 18, 1961, preamble, 55 Am.J.Int'l.L. 1064 (1961). We requested the views of the Department of State concerning the effect of service in this type of case on international relations and on the performance of diplomatic duties. The Department replied that service would prejudice the United States foreign relations and would probably impair the performance of diplomatic functions.[5] We conclude that the

goods or chattels are distrained, seized, or attached * * *." 22 U.S.C. §§ 252, 253 (1952). These statutes are liberally construed as being declarative of international law of diplomatic immunity. In re Baiz, 135 U.S. 403, 420, 10 S.Ct. 854, 34 L.Ed. 222 (1890); see Carrera v. Carrera, 84 U.S.App.D.C. 333, 174 F.2d 496 (1949); Bergman v. De Sieyes, 71 F. Supp. 334 (S.D.N.Y.1946).

3. We do not decide whether service of process by diplomatic note would violate diplomatic immunity. In reply to our request for information, the Department of State through its Acting Legal Adviser stated, "The Department would not, in the absence of express statutory or treaty provision, attempt to transmit the summons by an official diplomatic note to the embassy of a sending state, unless the embassy indicated a willingness to accept the summons." Letter from Leonard C. Meeker to John W. Douglas, Assistant Attorney General, August 10, 1964.

Although an ambassador may be served if he consents to service, the failure of the Marshal to state on the return that he attempted to ascertain whether the Ambassador would accept service voluntarily did not render the return inadequate. We do not think that the Marshal should be burdened with a duty to investigate whether diplomatic immunity will be waived. Rather that burden should rest on the party seeking service.

4. Article 29 of the Vienna Convention requires that "The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving state shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity." 55 Am. J.Int'l L. 1064, 1070–1071 (1961).

The Vienna Convention has been signed by 63 states, including the United States. It came into force on April 24, 1964, having been finally accepted by 28 states. The treaty is now before the United States Senate for its advice and consent to ratification. See Maktos, Diplomatic Immunity, 31 D.C.Bar J. 227, 231 (1964).

5. On possible impairment of a diplomatic officer's performance of official duty, the State Department said, "It is quite probable that such impairment would be caused; the degree of it would depend on the circumstances. An ambassador and his government would in all likelihood consider that he had been hampered in the performance of his duties if, for example, (a) the ambassador felt obliged to restrict his movements to avoid finding himself in the presence of a process server; or (b) he were diverted from the performance of his foreign relations functions by the need to devote time and attention to ascertaining the legal consequences, if any, of service of process

purposes of diplomatic immunity forbid service in this case.[6] Therefore, the Ambassador is not subject to service of process, and the return was adequate.

The judgment is

Affirmed.

WASHINGTON, Circuit Judge (concurring):

I concur in the result for reasons which will appear. First, I believe it desirable to describe with some particularity the factual situation here presented.

1. The Republic of Tunisia, a sovereign state, was alone named as the respondent in the libel in personam filed on November 30, 1962, by a Greek corporation as libelant. No attachment of any property of the Republic was attempted. The libel prayed that process issue against the Republic of Tunisia.[1] After consultation with the United States Attorney, the United States Marshal declined to attempt to serve the Republic and the summons was withdrawn unserved. On April 25, 1963, the libelant procured from the District Court a new summons directing that it be served upon the Republic's "principal agent residing in this District," the then Ambassador of Tunisia to the United States. After further consultation with the United States Attorney and with the United States Department of State, the Marshal made a return on May 16, 1963, indicating that the "named principal agent having Diplomatic Immunity and being listed in the Diplomatic List of the State Department cannot be served" in the District. The Greek libelant at no time has made any sort of showing that the Ambassador has consented, or is authorized, to accept service of process on be-

having been made, and to taking such action as might be required in the circumstances; or (c) the manner of service had been publicly embarrassing to him and called attention to the infringement of his personal inviolability." Moreover, "The maintenance of friendly foreign relations between the United States and the sending state concerned would certainly be prejudiced by service of process on an ambassador against his will. The sending state might well protest to the Department that the United States had failed to protect the person and dignity of its official representative, and might complain particularly that service was by an officer of the United States Government, namely, a United States Marshal. Other governments might interpret the incident as meaning that the Government of the United States had decided, as a matter of policy, to depart from what they had considered a universally accepted rule of international law and practice." Letter from Leonard C. Meeker, Acting Legal Adviser of the Department of State, to Nathan J. Paulson, Clerk of the United States Court of Appeals for the District of Columbia Circuit, January 13, 1965.

6. "[S]erious and far-reaching consequences would flow from a judicial finding that international law standards had been met if that determination flew in the face of a State Department proclamation to the contrary. When articulating principles of international law in its relations with other states, the Executive Branch speaks not only as an interpreter of generally accepted and traditional rules, as would the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 432, 84 S.Ct. 923, 942, 11 L.Ed.2d 804 (1964). Our courts have deferred to the views of the State Department as to whether sovereign immunity should be granted. See National City Bank of New York v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955); Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945); Ex parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); Compania Espanola de Navegacion Maritima, S.A. v. Navemar, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667 (1938).

1. The libel sought a money judgment in the nature of damages. Tunisia had paid the libelant, in advance of carriage, the contract price for carriage of a cargo of wheat to Tunisia. The libelant's claim is for damages based on the alleged failure of Tunisia, contrary to its alleged contractual obligation, to unload the wheat continuously after arrival at the port of Tunis with the consequence that the vessel bringing the wheat was, allegedly, needlessly delayed for an alleged period of about eleven days.

half of the government which he represents for diplomatic purposes in this country.

Pursuant to our request, the Attorney General communicated to us the views of the Department of State, as expressed in a letter dated August 10, 1964, and signed by its Acting Legal Adviser, on this matter. The Department there advised us, inter alia, that "diplomatic representatives of foreign governments are not generally authorized to accept service of process on behalf of their government"; that "The establishment by one country of a diplomatic mission in the territory of another does not implicitly or explicitly empower that mission to act as agent of the sending state for the purpose of accepting service of process"; and that the "Department of State, as in the case of any other foreign office, may not impute such authority to the diplomatic mission of the sending state."

The State Department also told us that in the fall of 1962 the then Tunisian desk officer at the Department made "several informal inquiries" of officials of the Tunisian Embassy as to "whether the Embassy of Tunisia would be willing to accept service of summons in this case," and that he was informed that "the Tunisian Embassy would be unwilling to accept service of process." [2] The Department of State advised further that it "would not, in the absence of express statutory or treaty provision, attempt to transmit the summons by an official diplomatic note to the embassy of a sending state, unless the embassy indicated a willingness to accept the summons."

This advice was supplemented by the State Department at the request of two members of the court in a second letter dated January 13, 1965. We were there advised, inter alia, in response to specific questions, that under the law of nations a duly accredited ambassador of another state is entitled to immunity from personal service by the United States Marshal of all process, inside or outside his Embassy, even though the basic suit names his sending state, rather than himself, as the party respondent; [3] that "The maintenance of friendly foreign relations between the United States and the sending state concerned would certainly be prejudiced by service of process on an ambassabor against his will"; and

2. We may infer that the Department's inquiries as to acceptance of service "in this case" were made after the libel was filed on November 30, 1962, perhaps at the request of the United States Marshal who then had the libel to serve upon the Republic of Tunisia, or possibly at the request of the libelant itself. The record shows that the Marshal had consulted the State Department before making his return.

We consider that we may properly (and perhaps must) consider as truthful and reliable the statements of the Department as to the activities of the Department and its officials in dealing with the representatives of Tunisia. See note 6, infra; cf. Shaffer v. Singh, 120 U.S. App.D.C. ——, 343 F.2d 324 (1965).

3. "Your letter of December 18, 1964 referred to the Department's letter of August 10, 1964 regarding the case of Hellenic Lines, Ltd. v. Moore, C.A. D.C. No. 18265, and stated that two members of the Court had requested the Department's comments on certain additional questions.

"The first question is whether the diplomatic immunity of an ambassador would preclude service on him by a United States marshal when the ambassador is outside of his embassy and when the process does not purport to join him as a party to a judicial action, or to compel his attendance in court, or to require other action by him, but rather purports to join his sending state as a party in a pending action. According to the law of nations, an ambassador who has been accepted and received as such by the President, and is still accredited, is entitled to personal inviolability. It has long been considered that an ambassador is immune from the service of all process, in the absence of a waiver of immunity, or of an indication that he is willing to accept service on behalf 'of his government or some other person. Diplomatic immunity is derived from the law of nations and is not limited to service of process in actions naming an ambassador as a party or requiring his presence in court.

that although service of process on an ambassador by registered mail [4] "might avoid some of the problems inherent in personal service by a marshal * * *, it would raise others—" [5]

In view of the advice of the Department, which we must respect (see footnote 7 *infra*), that the Ambassador of Tunisia has indicated that he is unwilling to accept service and that he is therefore immune from personal service in this suit under international law,[6] I join in holding that diplomatic immunity forbids personal service by the Marshal in this suit.

2. I agree that the Marshal's return of May 16, 1963, was more than adequate, even though he failed to state that he had attempted to ascertain whether the Ambassador would accept service. (As already pointed out, the record here suggests that he did so ascertain.) I would agree that the proper course of a complaining party seeking to serve process upon an accredited ambassador is to request the State Department to ascertain under accepted diplomatic practice whether diplomatic immunity, will be waived and service will be accepted in a particular case. I would also hold that the complaining party's proper course, if the answer is affirmative, is to request that the State Department make the diplomat's answer available to the court, and if the answer is negative the complainant should ordinarily discontinue its suit.[7]

4. It is to be observed that the libelant has not asked that service be accomplished by registered mail. Such attempted service might well not conform to Admiralty Rule 2 which seems to contemplate personal service, at least where, as here, no property of the named respondent has been attached. *Cf.* Walker v. Hughes, 132 F. 885 (S.D.N.Y.1904); Valkenburg, K.-G. v. The S.S. Henry Denny, 295 F.2d 330 (7th Cir. 1961); also Petrol Shipping Corp. v. Kingdom of Greece, Ministry of Commerce, Purchase Directorate, 326 F.2d 117 (2d Cir.), vacated and remanded on rehearing *en banc*, 332 F.2d 370 (2d Cir. 1964). In the case last cited, *no question as to the sufficiency of the service was raised, and the only issue before the court was the validity of the claim of sovereign immunity.*

5. "in particular the basic problem caused by an attempt to assert jurisdiction over a foreign government without its consent, through action directed at a diplomatic representative who by law is entitled to personal inviolability and is immune from all legal process. In the Department's experience, diplomatic missions have frequently expressed great concern when service of process has been attempted by mail addressed to the ambassador or another diplomatic officer."

6. I add that my own research fully confirms that under international law the Ambassador of Tunisia is immune from personal service in this case. See, in particular, Articles 22, 29–32 of the Vienna Convention on Diplomatic Relations, 55 AM.J.INT'L L. 1064, *et seq.* (1961); the Commentary of the International Law Commission which drafted the Vienna Convention, 53 AM.J.INT'L L. 230 at 267–268, 273 (1959); 1 OPPENHEIM, INTERNATIONAL LAW 711–717 (7th ed. 1948); IV HACKWORTH, DIGEST OF INTERNATIONAL LAW 462, 513–515 (1942); SATOW, A GUIDE TO DIPLOMATIC PRACTICE 174, *et seq.* (4th ed. 1957).

7. It is to be observed that a sovereign state has rarely been named as defendant or respondent, in suits brought in courts of this country for a money judgment against that state, as distinguished from suits based upon a seizure of property in this country claimed by the state, or counterclaims interposed after the foreign state has invoked a court's jurisdiction. So far as I am advised jurisdiction in such a suit has never been successfully obtained. See Purdy Co. v. Argentina, 333 F.2d 95 (7th Cir. 1964); Oster v. Dominion of Canada, 144 F.Supp. 746 (N.D.N.Y.), aff'd in open court *sub nom.* Clay v. Dominion of Canada, 238 F.2d 400 (2d Cir. 1956), cert. denied, 353 U.S. 936, 77 S.Ct. 813, 1 L.Ed.2d 759 (1957); Puente v. Spanish National State, 116 F.2d 43 (2d Cir. 1940), cert. denied 314 U.S. 627, 62 S.Ct. 57, 86 L.Ed. 504 (1941); Nankivel v. Omsk All Russian Government, 237 N.Y. 150, 142 N.E. 569 (1923), reversing 203 App.Div. 740, 197 N.Y.S. 467 (1922). And see New York and Cuba M.S.S. Co. v. Republic of Korea, 132 F.Supp. 684 (S.D.N.Y.1955), holding that the court must accept and follow the State Department's suggestion to the court that it adheres to the doctrine that the property of a foreign gov-

Compare, however, the so-called Tate letter (26 DEPT. STATE BULL. 984–985 (June 23, 1952)).

3. The libel in this case was filed by a foreign corporation and seeks a money judgment in the nature of damages against a foreign sovereign because of acts which took place at the port of La Gaulette, Tunis, Tunisia.[8] Neither does it appear that Tunisia has any property in the United States which has been attached or which could be levied upon if judgment were obtained. *Cf. Puente v. Spanish National State, supra, and New York and Cuba M.S.S. Co. v. Republic of Korea, supra.*[9] In the circumstances here—where both parties to the basic suit are foreign to this country, and the respondent is a foreign sovereign government, where the acts alleged to have given rise to the claim occurred wholly outside the United States, where the witnesses to such acts all appear to be located outside this country, where any money judgment rendered against the foreign state would be unenforceable in this country in the absence of a showing that

there is property of the sovereign which could be attached—it is clear that no American interest is involved.[10] It may be, therefore, though the point is not before us for decision, that the libel was properly dismissable in any event by the District Court,[11] irrespective of whether or not the Republic of Tunisia was immune from suit, the reason given here by the District Court for dismissal. The mandamus suit should in any event fail and was properly dismissed by the District Court.

To allow maintenance of this suit would tend, in my opinion, to make the District Court an international court of claims, open to suits for money judgments by citizens of any foreign country against their own or another foreign sovereign. Apart from the many other difficulties involved, I do not think the great burden of maintaining courts to handle international cases of the kind presented here should be imposed upon the taxpayers of this country. Perhaps the libeling Greek corporation can successfully pursue its claim against the Republic of Tunisia

ernment in the United States is immune from attachment. The motion to vacate the attachment of Korea's funds on deposit in New York banks was accordingly granted. Jurisdiction had been obtained there only through the attachment, no personal service having been sought against the Ambassador. To the same effect: United States of Mexico v. Schmuck, 294 N.Y. 265, 62 N.E.2d 64 Bank, 21 Misc.2d 1086, 192 N.Y.S.2d 469 (1945); Weilamann v. Chase Manhattan (1959). Cf. *Petrol Shipping Corp., etc., supra* n. 4.

8. See fn. 1, *supra*.

9. Moreover, "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). (Quoted and relied on in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, at 416, 84 S.Ct. 923, at 934, 11 L.Ed.2d 804, at 816 (1964). Compare, however, Public Law 88–633, 78 STAT. 1013 (Oct. 7, 1964); noted, 59 AM. J.INT'L L. 98 (1965).

10. We have been cited to no case in which an admiralty court in this country has entertained a suit against a foreign state, except those in which the ship involved has been attached within the territorial jurisdiction of the court, an American citizen is a party, or an American interest is otherwise involved. See, *e.g.*, cases cited in footnote 11, *infra*, and Compañia Española v. Navemar, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667 (1938); Ex parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 759 (1945). And cf. National City Bank of New York v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955).

11. Charter Shipping Co. v. Bowring, Jones & Tidy, 281 U.S. 515, 50 S.Ct. 400, 74 L.Ed. 1008 (1930); Canada Malting Co. v. Paterson Steamships, 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932); Swift & Co. Packers v. Compania Colombiana Del Caribe, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 492 (1950); United States Merchants' & Shippers Ins. Co. v. A/S Den Norske Afrika Og Australie Line, 65 F. 2d 392 (2d Cir. 1933).

through diplomatic channels, or in an international tribunal, or by suit in its own country or Tunisia. But it cannot successfully pursue the course which it has taken here.