Adella Chiminya TACHIONA, on her own behalf on behalf of her late husband Tapfuma Chiminya Tachiona, and on behalf of all others similarly situated, Efridah Pfebve, on her own behalf and on behalf of her late brother Metthew Pfebve, Elliot Pfebve, on his own behalf and on behalf of his brother Metthew Pfebve, Evelyn Masaiti, on her own behalf, Maria Del Carmen Stevens, on her own behalf, on behalf of her late husband David Yendall Stevens, and on behalf of all others similarly situated, Plaintiffs–Appellees–Cross–Appellants,

Robert Gabriel Mugabe, in his individual and personal capacity, Zimbabwe African National Union–Patriotic Front, Stan Mudenge, Jonathan Moyo, Certain Other Unknown Named Senior Officers of Zanu–PF, Defendants,

v.

UNITED STATES of America, Intervenor–Appellant–Cross–Appellee.

No. 03–6033(L), 03–6043(XAP).

United States Court of Appeals, Second Circuit.

Argued March 5, 2004.

Decided Oct. 6, 2004.

David S. Jones, Assistant United States Attorney, New York, NY (James B. Comey, United States Attorney for the Southern District of New York, and Meredith E. Kotler, Assistant United States Attorney, New York, NY; William H. Taft IV, Legal Advisor, David P. Stewart, Assistant Legal Advisor, and Wynne M. Teel, Attorney–Advisor, U.S. Department of State, Washington, D.C.; Douglas N. Letter and Lewis S. Yelin, Attorneys, Civil Division, U.S. Department of Justice, Washington, D.C., on the brief), for Intervenor–Appellant–Cross–Appellee.

Paul B. Sweeney, Hogan & Hartson L.L.P., New York, NY (Arianna R. Berg, Hogan & Hartson L.L.P., New York, NY; William J. Bowman, Mary Ellen Callahan, Keith J. Benes, and Nichelle Y. Johnson, Hogan & Hartson L.L.P., Washington, D.C.; Hamish P.M. Hume, Cooper & Kirk, P.L.L.C., Washington, D.C., on the brief), for Plaintiffs–Appellees–Cross–Appellants.

Steven M. Schneebaum, Patton Boggs LLP, Washington, D.C.; Joshua Sondheimer and Meetali Jain, Center for Justice and Accountability, San Francisco, CA, for Amici Curiae the Center for Justice & Accountability and International Law and Human Rights Law Scholars.

Philip Sapsford, Goldsmith Chambers, London, England, and Alexander Yanos, Freshfields Bruckhaus Deringer LLP, New York, NY, for Amicus Curiae the Bar Human Rights Committee for England and Wales.

Rebecca Davies, Dr. Benjamin Kremer, and Simon Rice, Sydney, Australia, for Amicus Curiae Australian Lawyers for Human Rights Inc.

Iain Byrne, Commonwealth Law Officer, Interights, London, England, for Amicus Curiae Interights the International Centre for the Legal Protection of Human Rights.

Before: WALKER, Chief Judge, CARDAMONE, Circuit Judge, and GLEESON, District Judge.[*]

JOHN M. WALKER, JR., Chief Judge.

The United States appeals from a default judgment entered by the United States District Court for the Southern District of New York (Victor Marrero, *Judge* ) against defendant the Zimbabwe African National Union–Patriotic Front ("ZANU–PF") for violations of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350 (2001), the Torture Victim Protection Act

---

[*] The Honorable John Gleeson, of the United States District Court for the Eastern District of New York, sitting by designation.

of 1991 ("TVPA"), Pub.L. 102–256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note), and international human rights norms. Plaintiffs cross-appeal from the district court's dismissal, for lack of subject-matter jurisdiction, of a host of similar claims brought against individual defendants Robert Mugabe and Stan Mudenge. The appeal and cross-appeal both turn on questions of immunity. The district court held that Mugabe and Mudenge were entitled to diplomatic and head-of-state immunity, but that their immunity did not protect them from service of process as agents for ZANU–PF—a non-immune, private entity. Accordingly, in the district court's view, ZANU–PF was properly served with process and thus subject to a default judgment upon failure to appear in this litigation. For the reasons that follow, we affirm the district court's dismissal of the claims against Mugabe and Mudenge but reverse its judgment against ZANU–PF and remand for entry of a judgment dismissing plaintiffs' claims against ZANU–PF.

## BACKGROUND

ZANU–PF is a private political party whose members have ruled Zimbabwe since 1980. At all relevant times, Robert Mugabe was the President of Zimbabwe and the President and First Secretary of ZANU–PF, and Stan Mudenge was the Zimbabwean Foreign Minister and a ZANU–PF official. In September 2000, Mugabe and Mudenge visited New York City as delegates to the United Nations ("U.N.") Millennium Summit. During their visit, they attended (and Mugabe spoke at) a private political rally and fundraiser at a church in Harlem—an event that was sponsored by a non-governmental organization called "Friends of ZANU–PF." Just before he entered the church, Mugabe was served with two copies of the complaint in this action, one in his personal capacity and the other on behalf of ZANU–PF. The next day, Mudenge was served with a copy of the same complaint on the street outside the Zimbabwe Mission building.

The complaint sought redress against Mugabe, Mudenge, ZANU–PF, and others for alleged violations of the ATCA, the TVPA, and international human rights norms. Plaintiffs (all of whom are Zimbabwean nationals) allege that they and/or their family members were subjected to torture, assault, execution, and other acts of violence at the hands of ZANU–PF members and upon the orders of ZANU–PF officials, including Mugabe and Mudenge. Mugabe and Mudenge were sued in their individual, not official, capacities. None of the defendants appeared before the district court at any stage of the ensuing litigation.

Several months after Mugabe and Mudenge were served with process, the United States filed a "suggestion of immunity" pursuant to 28 U.S.C. § 517,[1] in which it asserted that the claims against the two men should be dismissed on grounds of diplomatic and head-of-state immunity. The Government further argued that the claims against ZANU–PF should be dismissed because "under both the head of state and diplomatic immunity doctrines, [Mugabe and Mudenge] had 'personal inviolability' and could not be served with legal process in any capacity, including on behalf of ZANU–PF." J.A. at 326–35 (Suggestion of Immunity Submitted by the United States of America, dated February 23, 2001).

---

1. Section 517 provides that "any officer of the Department of Justice may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States."

In response to the Government's suggestion, plaintiffs argued that: (1) the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 to 1611—not the Government's suggestion of immunity—governs immunity determinations concerning heads of state; (2) the FSIA does not afford Mugabe and Mudenge immunity in this case because the two are alleged to have committed human rights violations in their non-official capacities; and (3) Mugabe and Mudenge were not entitled to diplomatic immunity during the course of their U.N.-sponsored trip to New York City and, thus, could be both sued individually and served with process as agents for ZANU–PF.

On October 30, 2001, the district court issued an order and decision dismissing the claims against Mugabe and Mudenge on immunity grounds but entering a default judgment against ZANU–PF. *See Tachiona v. Mugabe*, 169 F.Supp.2d 259 (S.D.N.Y.2001) ("*Tachiona I*"). The court concluded that the executive branch's suggestion of immunity, not the FSIA, governed immunity for heads of state, and that the suggestion mandated dismissal of the claims against Mugabe and Mudenge. *See id.* at 296–97. It also held, in the alternative, that diplomatic immunity precluded plaintiffs' suit against Mugabe and Mudenge. *See id.* at 297, 302. But the district court found that neither head-of-state immunity nor diplomatic immunity shielded foreign officials from service of process as agents for a private entity and, therefore, that Mugabe and Mudenge could be served as agents for ZANU–PF. *See id.* at 309. Thus, in the district court's view, ZANU–PF had been properly served and, having failed to appear in the action, was subject to a default judgment.

The Government moved for reconsideration and to intervene for purposes of appeal. On February 14, 2002, the district court denied the Government's motion for reconsideration, but granted its motion to intervene. *See Tachiona v. Mugabe*, 186 F.Supp.2d 383, 397 (S.D.N.Y.2002) ("*Tachiona II*"). In a final judgment dated December 19, 2002, following a damages inquest, the court held ZANU–PF liable for $20,250,453 in compensatory damages and $51,000,000 in punitive damages.

## DISCUSSION

In its appeal, the Government argues that the district court erred in determining that neither head-of-state immunity nor diplomatic immunity protected Mugabe and Mudenge from service of process as agents for ZANU–PF. Plaintiffs respond in the alternative, asserting that: (1) the Government lacks standing to appeal the district court's judgment against ZANU–PF in the absence of ZANU–PF's own demand for review of the judgment; and (2) on the merits, the default judgment against ZANU–PF should be upheld. They also cross-appeal the district court's dismissal of the claims against Mugabe and Mudenge. Our authority to review the merits depends on whether the Government has standing to appeal; we therefore address that issue first.

## I. Standing

Because Article III of the Constitution permits the adjudication of "Cases" or "Controversies" only, litigants appearing before federal courts must demonstrate that they have standing to invoke the court's jurisdiction. *See, e.g., Arizonans for Official English v. Arizona*, 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). To claim standing, a litigant must have suffered " 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent.' " *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct.

2130, 119 L.Ed.2d 351 (1992)) (internal quotation marks omitted). The Article III standing requirement "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Id.* (citing *Diamond v. Charles*, 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)). To have standing at the appellate stage, however, a litigant must demonstrate "injury caused by the judgment rather than injury caused by the underlying facts." 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3902, at 63 (2d ed.1992); *see also Diamond*, 476 U.S. at 62, 106 S.Ct. 1697 ("[T]he decision to seek review must be placed 'in the hands of those who have a direct stake in the outcome[,]' ... not ... in the hands of 'concerned bystanders[.]'") (citations omitted).

■ The Government sought the district court's permission to intervene for purposes of appeal pursuant to Rule 24(a) of the Federal Rules of Civil Procedure, and the district court granted that request. Although the Government's motion was both proper and prudent, *see Marino v. Ortiz*, 484 U.S. 301, 304, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988) (per curiam) (a nonparty seeking to appeal a judgment of the district court should first seek leave to intervene for purposes of appeal in the district court), a district court's grant of a motion to intervene for purposes of appeal does not, by itself, confer standing on the intervenor to appeal "in the absence of the party on whose side intervention was permitted." *Diamond*, 476 U.S. at 68, 106 S.Ct. 1697. (Here, of course, ZANU–PF is not appealing.) Resolution of the standing

question entails a separate inquiry into whether the Government's asserted injury and interest "fulfill[ ] the requirements of [Article] III." *Id.*

Plaintiffs argue that the Government has no standing to bring this appeal because it is not "bound" by the judgment of the district court and because, even if *res judicata* effect is not a prerequisite to standing, the Government's purported interests are too amorphous to confer standing.[2] Although plaintiffs' arguments are not without some force, we ultimately find them to be unpersuasive.

■ As plaintiffs note, it is well established that a party not bound by a judgment cannot appeal a district court's decision on the sole ground that the decision sets a precedent unfavorable to the would-be appellant. *See Boston Tow Boat Co. v. United States*, 321 U.S. 632, 633, 64 S.Ct. 776, 88 L.Ed. 975 (1944). More generally, a party not bound by a judgment will, in the usual case, have difficulty showing that it meets the Article III standing requirement. *See, e.g., Arizonans for Official English*, 520 U.S. at 66, 117 S.Ct. 1055 (expressing "grave doubts" as to whether parties who "were not bound by the judgment" of the district court had Article III standing to appeal). But that is not because there is a *per se* bar against appeals by parties not bound by the judgment; rather, it is because such parties normally will not have sustained a "legal injury, actual or threatened," as a result of the judgment. *See Edward Hines Yellow Pine Trs. v. United States*, 263 U.S. 143, 148, 44 S.Ct. 72, 68 L.Ed. 216 (1923) (cited in *Boston Tow Boat*, 321 U.S. at 634, 64

**2.** Plaintiffs also contend that the Government cannot "interfere with litigation brought by and against private parties" unless "Congress has expressly authorized such action." Rep. Br. of Plaintiffs–Appellees–Cross-Appellants, at 7. But the only authority cited in support of

this proposition, *Ruotolo v. Ruotolo*, 572 F.2d 336 (1st Cir.1978), expressly acknowledges that "the United States may sometimes sue without statutory authority," for example, when the case involves a "national issue of great moment or urgency." *Id.* at 339.

S.Ct. 776). By contrast, we think the asserted injury to the Government's interests in this case, caused by the district court's judgment, is sufficiently concrete to give it standing to bring this appeal.

■ The Government claims that the district court's judgment invaded its legally protected interests in two ways: (1) it placed the United States in violation of certain international treaties; and (2) it usurped the executive branch's exclusive authority to set the terms upon which the United States receives foreign ambassadors. As to the first, the Government argues that the district court's decision interferes with its obligation to ensure that the United States complies with the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972) [hereinafter Vienna Convention], and the Convention on the Privileges and Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T. 1418, T.I.A.S. No. 6900 (ratified by the U.S. Apr. 29, 1970) [hereinafter U.N. Convention on Privileges and Immunities]. The existence of the asserted interest can hardly be disputed; pursuant to Article II of the Constitution, the President has "the Power, by and with the Advice and Consent of the Senate, to make Treaties." U.S. Const. art. II, § 2, cl. 2. A corollary to the executive's power to enter into treaties is its obligation to ensure that the United States complies with them.

Here, the district court was called upon to interpret the U.N. Convention on Privileges and Immunities and the Vienna Convention. The Government's claim that the district court's interpretation contravenes the intent of the treaties' signatories, placing the United States in breach of its international obligations, alleges a concrete invasion of the executive's legal interest. *See, e.g., Roeder v. Iran,* 333 F.3d 228, 233–34 (D.C.Cir.2003), *cert. denied, ——*

U.S. ——, 124 S.Ct. 2836, 159 L.Ed.2d 287 (2004). In *Roeder,* the District of Columbia Circuit considered whether the United States had standing to intervene as a defendant in a lawsuit against the Iranian government. Although the court questioned whether a defendant-intervenor must satisfy the Article III standing requirement, *see id.* at 233–34, it assumed the requirement applied, and concluded that because the Government had "established that it was in imminent danger of suffering injury in fact—a breach of its obligations under the [Algiers] Accords," it had standing, *id.* at 233–34. *See also, e.g., Sanitary Dist. v. United States,* 266 U.S. 405, 425, 45 S.Ct. 176, 69 L.Ed. 352 (1925) ("[The United States] has a standing in this suit ... to carry out treaty obligations to a foreign power ..., and no statute is necessary to authorize the suit [by the Attorney General]."); *United States v. County of Arlington,* 669 F.2d 925, 929–30 (4th Cir.1982) (United States had standing to initiate action to seek relief from conduct that would, *inter alia,* cause treaty violation). The only apparent distinction between the foregoing cases and this one is that here it is the district court's decision, and not the action of any party, that threatens a breach of the United States's treaty obligations. For purposes of standing, that is a distinction without a difference.

The Government next argues that the district court's decision upholding service of process on Mugabe and Mudenge as agents for ZANU–PF usurped the executive branch's constitutional authority to conduct foreign affairs and to send and receive ambassadors. Plaintiffs do not dispute that the power to conduct foreign affairs is vested principally in the executive branch. Indeed, Article II, section 3 of the Constitution assigns to the President the authority to "receive Ambassa-

dors and other public Ministers," while (as discussed above) Article II, section 2 gives the President the power to make treaties, albeit with the advice and consent of the Senate.

> Taken together with the command of Article II, [section] 3 that the President "shall take Care that the Laws be faithfully executed," these constitutional provisions have come to be regarded as explicit textual manifestations of the inherent presidential power to administer, if not necessarily to formulate ..., the foreign policy of the United States.

Lawrence H. Tribe, *American Constitutional Law* § 4–3, at 638 (3d ed.2000); *see, e.g., Dep't of Navy v. Egan,* 484 U.S. 518, 529, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) ("The Court ... has recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive.'") (quoting *Haig v. Agee,* 453 U.S. 280, 293–94, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981)). Courts have long construed this executive authority to encompass a near-exclusive power to dictate the terms upon which foreign diplomats are received in this country. *See, e.g., Nat'l Petrochemical Co. of Iran v. The M/T Stolt Sheaf,* 860 F.2d 551, 553 (2d Cir.1988) (noting that an incident to the executive's constitutional powers is the President's "exclusive authority to recognize or refuse to recognize a foreign state or government and to establish or refuse to establish diplomatic relations with it"); *see also United States v. Al–Hamdi,* 356 F.3d 564, 572–73 (4th Cir.2004) (holding that State Department's certification that an individual was not entitled to diplomatic immunity was "conclusive evidence" of lack of entitlement because of the executive's power to send and receive ambassadors) (citing *In re Baiz,* 135 U.S. 403, 421, 10 S.Ct. 854, 34 L.Ed.

222 (1890), and *Ex Parte Hitz,* 111 U.S. 766, 767, 4 S.Ct. 698, 28 L.Ed. 592 (1884)).

Plaintiffs contend nevertheless that the alleged injury to the Government's authority to receive foreign ambassadors is too abstract to permit the Government to appeal the decision below. To support this proposition, they rely on the Supreme Court's decision in *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), in which individual members of Congress were held to lack standing to challenge a line-item veto statute because they "alleged no injury to themselves as individuals [and] the institutional injury they alleg[ed] [was] wholly abstract and widely dispersed." *Id.* at 829, 117 S.Ct. 2312. But *Raines* is distinguishable in crucial respects from the instant case. First, *Raines* involved a constitutional challenge to an action taken by one of the other two branches of the Federal Government—a fact that the Court believed merited an "especially rigorous" standing inquiry because it implicated the "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere." *Id.* at 819–20, 117 S.Ct. 2312. Here, by contrast, we are not being asked to review the actions taken by another branch, but rather to determine whether a component of our own branch of government, *i.e.,* the district court, has overstepped its bounds. That kind of review is the standard grist of appellate courts.

Second, the basis for the Supreme Court's denial of standing in *Raines* was that the individual members of Congress had not alleged any personal injury to themselves, and their alleged institutional injury—*viz.,* that the line-item veto, irrespective of whether it was used by the President, altered the "'meaning'" and "'effectiveness'" of the members' votes, *id.* at 817, 825–26, 117 S.Ct. 2312—was

"wholly abstract and widely dispersed."[3] Here, the executive branch's institutional interest in protecting its authority to conduct foreign affairs and receive foreign ambassadors is not "abstract" because the direct effect of the district court's ruling would be to permit service of process upon Mugabe and Mudenge—a result that, if the Government is correct, would violate executive norms and treaty obligations.

The Court in *Raines* was careful to distinguish the situation in which, for example, a legislator's vote is nullified, *see Coleman v. Miller*, 307 U.S. 433, 446–47, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (state senators had standing to challenge ratification of a constitutional amendment which had been effected, despite senate deadlock, when the lieutenant governor cast the deciding vote), from a situation, like the one in *Raines*, where the only injury claimed is an "abstract dilution of institutional legislative power" that resulted from the President's discretion to exercise a line-item veto. *Raines*, 521 U.S. at 826, 117 S.Ct. 2312. The executive's interest in this case is more akin to that in *Coleman;* the allegation is not that the district court's decision may have resulted in dilution of the executive's constitutional authority to conduct foreign affairs, but that it interfered in a direct, articulable way with that authority. *See also United States ex rel. Chapman v. Fed. Power Comm'n*, 345 U.S. 153, 155–56, 73 S.Ct. 609, 97 L.Ed. 918 (1953) (holding that the Secretary of Interior had standing to bring an action challenging the Federal Power Commission's authority to grant a license because the license conflicted with the Secretary's statutory duties).

We conclude that the asserted adverse effects of the district court's decision on the Government's interests in (1) ensuring

that the United States does not violate its treaty obligations, and (2) guarding its authority to set the terms upon which foreign ambassadors are received, are sufficient to confer standing on the Government to appeal the district court's ruling upholding the service of process on Mugabe and Mudenge as agents for ZANU–PF. Assuming *arguendo* that the Government must also establish that it has standing to defend the district court's ruling concerning Mugabe and Mudenge's immunity from suit, *cf. Roeder*, 333 F.3d at 233, the two interests it has asserted suffice for that purpose as well; the cross-appeal, no less than the appeal, implicates the executive branch's constitutional powers and responsibilities in the arena of international relations. The threshold standard having been met, we now turn to the merits of the appeal and cross-appeal.

## II. The Merits

The Government's argument on appeal—that Mugabe and Mudenge were shielded from service of process as agents for ZANU–PF—presupposes the correctness of the district court's ruling that the two individuals enjoyed diplomatic and/or head-of-state immunity; if the two were not immune from suit, then they could not claim that their protected status also shielded them from service of process as agents for a non-immune entity. Logic therefore compels us to first consider the merits of plaintiffs' cross-appeal challenging the district court's immunity finding before addressing the Government's appeal.

### A. *Diplomatic Immunity*

The district court dismissed plaintiffs' claims against Mugabe and Mudenge be-

3. *Id.* at 829, 117 S.Ct. 2312. Both Houses of Congress "actively oppose[d]" the plaintiffs' lawsuit, a fact to which the Court "attach[ed] some importance." *Id.*

cause, *inter alia*, it concluded that the two were entitled to diplomatic immunity under the U.N. Convention on Privileges and Immunities and the Vienna Convention. We affirm for substantially the same reasons articulated by the district court.

The immunities afforded temporary representatives like Mugabe and Mudenge who visit the United States for a U.N. conference are set forth in Article IV, section 11 of the U.N. Convention on Privileges and Immunities:

Representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations, shall, while exercising their functions and during their journey to and from the place of meeting, enjoy the following privileges and immunities:

a. immunity from personal arrest or detention and from seizure of their personal baggage, and, in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind;

b. inviolability for all papers and documents;

c. the right to use codes and to receive papers or correspondence by courier or in sealed bags;

d. exemption in respect of themselves and their spouses from immigration restrictions, alien registration or national service obligations in the state they are visiting or through which they are passing in the exercise of their functions;

e. the same facilities in respect of currency or exchange restrictions as

are accorded to representatives of foreign governments on temporary official missions;

f. the same immunities and facilities in respect of their personal baggage as are accorded to diplomatic envoys, and also;

g. such other privileges, immunities and facilities not inconsistent with the foregoing as diplomatic envoys enjoy, except that they shall have no right to claim exemption from customs duties on goods imported (otherwise than as part of their personal baggage) or from excise duties or sales taxes.

U.N. Convention on Privileges and Immunities, *supra*, 21 U.S.T. 1418, art. IV, § 11. The only part of this section that expressly addresses the immunity from legal process afforded temporary U.N. representatives is section 11(a). Standing alone, section 11(a) would not protect Mugabe and Mudenge from suit based on any acts of violence they perpetrated in Zimbabwe, because such acts are not "acts done by them in their capacity as representatives." Section 11(g), however, extends to temporary U.N. representatives "such other privileges, immunities and facilities not inconsistent with [sections 11(a) to (f)] as diplomatic envoys enjoy."

The Vienna Convention, which governs the privileges and immunities that are extended to diplomatic envoys, provides for a much more robust form of immunity from legal process than that afforded by section 11(a) of the U.N. Convention on Privileges and Immunities. With limited exceptions, it broadly immunizes diplomatic representatives from the civil jurisdiction of the United States courts.[4]

---

**4.** Article 31 of the Vienna Convention provides in relevant part:

(1) A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the

receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

Plaintiffs argue that reading section 11(g) of the U.N. Convention on Privileges and Immunities to extend to Mugabe and Mudenge the full measure of immunity set forth in Article 31 of the Vienna Convention would be "inconsistent with" section 11(a) of the U.N. Convention on Privileges and Immunities because section 11(a) expressly limits the scope of immunity from legal process that temporary U.N. representatives can enjoy. In plaintiffs' view,

> [s]ection 11(g) should not be read to "override" [sections 11(a) to (f)], but should instead be read to be a reference to "privileges, immunities, and facilities" afforded to diplomats but *not* specifically referenced in [sections 11(a) to (f)], such as the right to use the representative's national flag on his means of transport (Vienna Convention Art. 20).

Reply Br. of Plaintiffs–Appellees–Cross–Appellants, at 28.

■■ We join the district court in declining to adopt plaintiffs' overly narrow interpretation of section 11(g). "When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used." *E. Airlines, Inc. v. Floyd,* 499 U.S. 530, 534, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988)) (internal quotation marks omitted). "[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Id.* at 535, 111 S.Ct. 1489 (quoting

*Air France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985)) (internal quotation marks omitted). Further, in construing treaty language, "[r]espect is ordinarily due the reasonable views of the Executive Branch." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999); *see Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). "But where the text [of the treaty] is clear, ... [courts] have no power to insert an amendment." *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989).

■ Applying these principles, we conclude, as a preliminary matter, that the text of section 11 of the U.N. Convention on Privileges and Immunities is ambiguous. It is not clear what would make a particular immunity or privilege "inconsistent with" any of the privileges and immunities specifically enumerated in section 11. Would the proposed immunity or privilege have to render the exercise of an enumerated privilege or immunity impossible? Or would it be enough (as plaintiffs assert) for it to negate certain limitations or conditions that otherwise would attach to the exercise of an enumerated privilege or immunity? The answer is not evident from the face of the treaty. Therefore, we must resort to other interpretive tools.

(a) a real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(b) an action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;

(c) an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

Plaintiffs argue that ordinary principles of statutory construction do not permit a reading of section 11(g) that would expand the circumstances under which immunity from legal process attaches. First, they point out that reading section 11(g) as a grant of near-absolute immunity from suit would render section 11(a) superfluous—a result not favored by principles of statutory construction. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 113, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). Second, they cite the rule that, where a statutory text lists a number of items *seriatim* (as in sections 11(a) to (f)), the specific qualifications in one provision cannot be overridden by a general catch-all clause (like section 11(g)). *See id.* at 114–15, 121 S.Ct. 1302 (general phrases are "controlled and defined by reference to the enumerated categories"); *Varity Corp. v. Howe,* 516 U.S. 489, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

These arguments are not without force. But while general principles of statutory construction "may be brought to bear on difficult or ambiguous passages" of a treaty, *Schlunk,* 486 U.S. at 700, 108 S.Ct. 2104, the understandings of the treaty signatories and the views of the executive branch are at least as important in resolving ambiguity. *See Saks,* 470 U.S. at 396, 105 S.Ct. 1338; *see also Hakala v.*

*Deutsche Bank AG,* 343 F.3d 111, 116 (2d Cir.2003) ("General principles of statutory construction are notoriously unreliable."). Here, those understandings and views overwhelmingly support an interpretation of section 11(g) that would accord the full protection of Article 31 of the Vienna Convention to temporary U.N. representatives.

First, the United States government officials who ratified the U.N. Convention on Privileges and Immunities plainly believed that it would afford full diplomatic immunity to temporary U.N. representatives. Two excerpts from a report of the Senate Committee on Foreign Relations, which was charged with considering whether the United States should ratify the U.N. Convention on Privileges and Immunities, are particularly relevant.[5] *See generally* Comm. on Foreign Relations, *Convention on the Privileges and Immunities of the United Nations,* S. Exec. Rep. No. 91–17, at 3, 11–12 (1970) [hereinafter Senate Report]. The first is a statement by State Department Legal Advisor John R. Stevenson during hearings before the committee on March 9, 1970. He said:

At the present time resident representatives are already granted full diplomatic privileges and immunities under the headquarters agreement.[6] Nonresi-

---

**5.** Plaintiffs contend that statements made during the pre-ratification hearings in the Senate cannot be used to divine the meaning of the Convention because they "were made twenty-four years *after* the Convention was drafted and adopted by the U.N. General Assembly." Rep. Br. of Plaintiffs–Appellants–Cross-Appellants, at 30 (emphasis in original). Contrary to plaintiffs' contention, however, the Supreme Court has expressly approved the use of such materials in interpreting international treaties, and has even suggested that they are *more* useful than treaties' negotiation history. *See United States v. Stuart,* 489 U.S. 353, 367–68, 367 n. 7, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989).

**6.** At the time of these hearings, the "headquarters agreement" between the United States and the U.N. governed immunity from suit for *resident* U.N. representatives. *See* Agreement respecting the headquarters of the United Nations, June 26, 1947, U.S.-U.N., 61 Stat. 3416, T.I.A.S. No. 1676 (entered into force Nov. 21, 1947). Article V, § 15 of the headquarters agreement provided that resident representatives "shall ... be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as [the United States] accords to diplomatic envoys accredited to it." *Id.* at 3428.

dent representatives, on the other hand, are only covered by the International Organizations Immunities Act and that grants them immunities relating to acts performed by them in their official capacity.

Under the [U.N. Convention on Privileges and Immunities], the nonresident representatives would also receive full diplomatic privileges and immunities.

. . . .

. . . [M]any of the nonresident representatives are distinguished parliamentarians who come to New York for very short periods of time and we believe they should be treated with the same respect as the permanent representatives.

*Id.* app. at 11–12 (Stat. of Hon. John R. Stevenson, Legal Advisor, Dep't of State). The second excerpt is a statement of the Senate Committee itself:

With regard to representatives of members, currently only resident representatives of permanent missions to the U.N. have full diplomatic immunities. Nonresident representatives enjoy only functional immunities; that is, immunities with respect to their official acts. Under the [U.N. Convention on Privileges and Immunities], these nonresident representatives will also be entitled to full diplomatic immunities.

*Id.* at 3.

As evidenced by these excerpts, the Senate Committee on Foreign Relations and the State Department both believed that the U.N. Convention on Privileges and Immunities would confer more than just "functional" immunity, *i.e.,* the type of immunity described in section 11(a), on temporary U.N. representatives; they under-

stood that such representatives would be afforded "full diplomatic immunities." *Id.* That section 11(g) was intended to supplement the protection provided by section 11(a) is further supported by a table submitted by State Department Legal Advisor Stevenson during the March 9, 1970 hearings, the purpose of which is to illustrate the effect of the U.N. Convention on Privileges and Immunities in certain typical civil and criminal situations involving "nonofficial activities." *Id.* app. at 29 (table). The table indicates that, in contrast to prior law, "Nonresident (temporary) representative[s]" would be "immune from suit or prosecution *under sec. 11(g)*." *Id.* (emphasis added).

This inclusive interpretation of section 11(g) was also adopted by former U.N. Secretary–General Kurt Waldheim in a 1976 opinion concerning immunity from legal process:

Section 11 of [the] Convention specifies the more important immunities attaching to "the representatives of Members[,"] including "immunity from legal process of every kind[,"] and, in subsection (g) thereof, explicitly extends to representatives, in addition, "such other privileges, immunities and facilities not inconsistent with the foregoing as diplomatic envoys enjoy" . . . . In other words, taken as a whole, Section 11 of the Convention *in fact confers . . . diplomatic privileges and immunities* on the representatives of Members.

1976 U.N. Jurid. Y.B. 224, 227 (emphasis added). Taken together, Secretary–General Waldheim's opinion, the Senate Report excerpts discussed above, and the broad interpretation of section 11(g) advanced by the Government in this litigation (which is accorded "great weight," *see*

By contrast, *temporary* U.N. representatives were only "immune from suit and legal process relating to acts performed by them in

their official capacity and falling within their functions as . . . representatives." 22 U.S.C. § 288d(b) (2001).

*Sumitomo Shoji Am.*, 457 U.S. at 185, 102 S.Ct. 2374), persuade us that section 11(g) extends to temporary U.N. representatives like Mugabe and Mudenge the full range of immunity from legal process afforded by Article 31 of the Vienna Convention.

■ One potential obstacle remains, however, to affording Mugabe the full protection of Article 31 of the Vienna Convention: section 11 of the U.N. Convention on Privileges and Immunities stipulates that the immunities described therein, including the diplomatic immunities set forth in section 11(g), apply only while the U.N. representative is "exercising [his] functions and during [his] journey to and from the place of meeting." U.N. Convention on Privileges and Immunities, *supra*, 21 U.S.T. 1418, art. IV, § 11 (prefatory language). Whereas Mudenge was served with process outside of the Zimbabwe Mission building and, therefore, squarely within the parameters set forth in section 11, Mugabe was served with process while attending a ZANU–PF fund-raising rally, a private activity unrelated to his duties as a U.N. representative. Plaintiffs argue that because Mugabe was not acting in his capacity as a U.N. representative when he was served with copies of the complaint, he cannot claim immunity under section 11.

Taking our cue from former U.N. Secretary–General Waldheim, we decline to read the prefatory language of section 11 so narrowly. Secretary–General Waldheim, recognizing that U.N. representatives traveling to U.N. conferences typically engage in activities ancillary to their actual representative functions, interpreted the words "while exercising their functions" to mean "during the entire period of presence in the State ... for reasons of the conference in question." 1976 U.N. Jurid. Y.B. 224, 228 (quoting 1967 Y.B. Int'l L. Comm. at 176 ¶·87). Waldheim explained that "to interpret [the prefatory words] so as to limit them to times when the person concerned is actually doing something as part of his functions as a representative ... leads to absurd and meaningless results making such an interpretation wholly untenable." *Id.*

We can imagine hypothetical situations in which section 11's prefatory language might foreclose a temporary U.N. representative's entitlement to the immunities set forth in section 11; for example, if a representative were served with process months after the completion of a U.N. conference while traveling in the United States for purely personal reasons. But this is not such a case; Mugabe was served while the U.N. Millennium Summit was still in progress. Under the circumstances, he was entitled, through section 11(g), to the full protection of Article 31 of the Vienna Convention.

■ Having determined that Mugabe and Mudenge are subject to the terms of Article 31, we now consider whether any of the exceptions found in that Article apply. Article 31(1) provides:

A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

(a) a real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(b) an action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;

(c) an action relating to any professional or commercial activity exercised by

the diplomatic agent in the receiving State outside his official functions. Vienna Convention, *supra*, 23 U.S.T. 3227, art. 31(1). While plaintiffs concede the inapplicability of these exceptions to Mudenge, they assert that subsection (c) deprives Mugabe of immunity from legal process because the ZANU–PF rally that he attended "had nothing at all to do with [his] 'official functions' as a representative of Zimbabwe to the U.N." Br. of Plaintiffs–Appellees–Cross–Appellants, at 56. The key words in subsection (c), however, are "activity ... *in the receiving State.*" Plaintiffs' lawsuit falls outside the scope of subsection (c) because plaintiffs' claims do not "relat[e] to" Mugabe's activities at the rally; they relate to his activities in Zimbabwe.

Plaintiffs nevertheless attempt to identify a nexus between their lawsuit and the ZANU–PF rally by arguing that

the rally seemed specifically designed to combat the extensive international outrage directed toward Mugabe personally and against ZANU–PF as an organization—outrage triggered specifically by the murderous tactics that ZANU–PF inflicted on its political opponents, such as the Plaintiffs in this case.

Br. of Plaintiffs–Appellees–Cross–Appellants, at 56. We decline to adopt this exceedingly broad conception of "relating to." Although the term "relating to" (or "related to"), when used in statutes, is typically defined more broadly than the term "arising out of," it still connotes a "connection" with, "reference to," or "associat[ion] with" its object. *See Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128–29 (2d Cir.2001) (quoting Webster's Third New International Dictionary 117 (1986) and *Jackson v. Lajaunie*, 270 So.2d 859, 864 (La.1972)) (internal quotation marks omitted). As we noted in *Coregis*, Webster's Dictionary defines "related"

as "connected by reason of an established or discoverable relation." *Id.* at 128 (internal quotation marks omitted). Plaintiffs' complaint makes no "reference to," nor does it have an "established or discoverable relation" to, Mugabe's participation in the Friends of ZANU–PF rally; it is based entirely on events that occurred well before the rally and many thousands of miles away.

Since none of the other exceptions under Article 31(1) is relevant here, Mugabe and Mudenge are both entitled to diplomatic immunity from suit under the terms of the Vienna Convention and the U.N. Convention on Privileges and Immunities. Therefore, the claims filed against them individually were properly dismissed.

### B. *Head–of–State Immunity*

The district court held that Mugabe and Mudenge were also entitled to immunity from suit as heads of state because the Government had filed a suggestion of head-of-state immunity on their behalf, which, in the court's view, was dispositive. *See Tachiona I*, 169 F.Supp.2d at 297. Plaintiffs argue that this was error because the FSIA, not the executive's suggestion of immunity, governs head-of-state immunity determinations, and neither Mugabe nor Mudenge is entitled to the protections afforded under the Act.

We have some doubt as to whether the FSIA was meant to supplant the "common law" of head-of-state immunity, which generally entailed deference to the executive branch's suggestions of immunity. *See Ex Parte Peru*, 318 U.S. 578, 589, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); *see also Wei Ye v. Jiang Zemin*, 383 F.3d 620, 2004 WL 1984430, at *3 (7th Cir. Sept.8, 2004) (holding that FSIA does not apply to heads of state). For one thing, the FSIA applies only to foreign states, which are defined as including "political subdivision[s]," and

"agenc[ies] or instrumentalit[ies]" thereof. *See* 28 U.S.C. § 1603(a). "[A]genc[ies] [and] instrumentalit[ies]" in turn are defined in terms not usually used to describe natural persons. *See* 28 U.S.C. § 1603(b) (defining "agency or instrumentality" as an "entity" that, *inter alia*, is "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," 28 U.S.C. § 1603(b)(2)). *But see, e.g., Chuidian v. Phil. Nat'l Bank*, 912 F.2d 1095, 1100–03 (9th Cir.1990) (holding that the FSIA grants immunity to lower foreign government officials for acts committed in their official capacity). Moreover, the only references to heads of state or other foreign officials in the FSIA's legislative history suggest that their immunity is not governed by the Act. *See* H.R.Rep. No. 94–1487, at 21 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6620 (describing bill that would later become the FSIA as "deal[ing] only with the immunity of foreign states and not its diplomatic or consular representatives") [hereinafter House Report]; *Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the House Comm. on the Judiciary*, 93rd Cong. 16 (1973) (statement of Bruno Ristau, Chief, Foreign Litigation Unit, Civil Division, Department of Justice) ("[W]e are not talking . . . in terms of permitting suit against the Chancellor of the Federal Republic [of Germany] . . . . That is an altogether different question.").

In light of our conclusion that the claims against Mugabe and Mudenge were properly dismissed on the basis of diplomatic immunity, however, we have no occasion to decide whether Mugabe and Mudenge were protected from suit by head-of-state immunity—whether under the terms of the FSIA or because of the Government's suggestion of immunity. Nor do we have any occasion to decide whether head-of-state immunity protected Mugabe and Mudenge from service of process as agents for ZANU–PF, *cf. Wei Ye*, 383 F.3d 620, 2004 WL 1984430, at \*6 (holding that executive branch's "power to recognize the immunity of a foreign head of state includes the power to preclude service of process in that same suit on the head of state even where that service is intended to reach third parties"); that question is mooted by our conclusion, explained below, that diplomatic immunity rendered the service of process a nullity.

### C. *Service of Process*

■■ As discussed above, *see* Part II(A), *supra*, section 11(g) of the U.N. Convention on Privileges and Immunities extends to Mugabe and Mudenge the immunities that diplomats enjoy under the Vienna Convention. These include not only the immunity from legal process set forth in Article 31, but also the "inviolability" of the person:

> The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.

Vienna Convention, *supra*, 23 U.S.T. 3227, art. 29. The Government argues that the district court erred in holding that Article 29 of the Vienna Convention did not protect Mugabe and Mudenge from service of process as agents of process for ZANU–PF. *See Tachiona I*, 169 F.Supp.2d at 309. We agree.

Although the term "inviolable" is not defined in the Vienna Convention, we have described it as "advisedly categorical" and "strong." *767 Third Ave. Assocs. v. Permanent Mission of Zaire*, 988 F.2d 295,

298 (2d Cir.1993) (discussing inviolability of mission premises under Article 22 of the Vienna Convention). The text of Article 29 makes plain that a person entitled to diplomatic immunity may not be arrested or detained. The scope of inviolability, however, extends further; Article 29 also protects against "attack[s]" on the "person, freedom or dignity" of the diplomatic envoy. Vienna Convention, *supra,* 23 U.S.T. 3227, art. 29. For example, courts have held that the inviolability principle precludes service of process on a diplomat as agent of a foreign government, *see Hellenic Lines, Ltd. v. Moore,* 345 F.2d 978, 979–81 (D.C.Cir.1965), and, as applied to missions, prevents a landlord from seeking to evict a diplomatic mission from its premises for non-payment of rent, *see 767 Third Ave. Assocs.,* 988 F.2d at 302.

■ The district court gave two principal reasons for its conclusion that the inviolability principle did not protect Mugabe and Mudenge from service of process as agents for ZANU–PF. First, it observed that the FSIA permits service of process on an agency or instrumentality of a foreign state by, *inter alia,* "delivery of a copy of the summons and complaint" to officers and agents of the agency or instrumentality, 28 U.S.C. § 1608(b)(2), which could conceivably include "a state official or diplomat otherwise entitled to immunity." *Tachiona I,* 169 F.Supp.2d at 306. The court did not suggest that § 1608(b)(2) provided any express justification for the service of process on Mugabe and Mudenge as agents for ZANU–PF (which is, after all, a private entity and not an agency or instrumentality of a foreign state), but thought the provision "contemplate[d] and legitimize[d] the point that the doctrine of inviolability does not serve as an absolute barrier to the service of process in certain limited circumstances." *Id.* at 306–07. Second, the district court

implied from the fact that Article 31 of the Vienna Convention sets forth certain enumerated exceptions to immunity from suit that "service of process *per se* does not offend the concept of personal inviolability." *Id.* at 307. For the reasons that follow, we decline to adopt the district court's reasoning.

As the district court observed, the FSIA permits service of process on "an officer, a managing or general agent, or ... any other agent authorized by appointment or by law to receive service of process in the United States" on behalf of an agency or instrumentality of a foreign state. 28 U.S.C. § 1608(b)(2). While it is true that, in the abstract, this category of persons could include agents or officers who are otherwise entitled to diplomatic immunity, we decline to construe the FSIA as a license to serve process on diplomatic and consular representatives, even as agents for private, non-immune entities. As a preliminary matter, § 1608(b)(2) permits personal service on an agent or officer of an *agency or instrumentality* of the foreign state (*e.g.,* the president of a foreign bank) *only;* absent special agreement, the FSIA does not permit personal service on agents or officers of the foreign state itself. *See* 28 U.S.C. § 1608(a); *Gray v. Permanent Mission of People's Republic of Congo,* 443 F.Supp. 816, 819–21 (S.D.N.Y.), *aff'd,* 580 F.2d 1044 (2d Cir. 1978). While one can perhaps envision a situation in which the officer of the agency or instrumentality (like the bank president) is also a state official entitled to diplomatic immunity, such a coincidence is not so likely as to warrant the presumption that Congress intended, when it sanctioned service of process on agents and officers of an agency or instrumentality of a foreign state, to also permit service of process on state officials entitled to diplomatic immunity. Indeed, the legislative history of the FSIA demonstrates unequivocally that the

Act was not intended to affect the immunity of "diplomatic or consular representatives." House Report, supra, at 21, 1976 U.S.C.C.A.N. at 6620. Congress expressly stated that persons entitled to diplomatic immunity would not be proper agents for service under the FSIA:

> It is also contemplated that the courts will not direct service in the United States upon diplomatic representatives, Hellenic Lines Ltd. v. Moore, 345 F.2d 978 (D.C.Cir.1965), or upon consular representatives, Oster v. Dominion of Canada, 144 F.Supp. 746 (N.D.N.Y. 1956), aff'd, 238 F.2d 400 (2d Cir.1956).

House Report, supra, at 25, 1976 U.S.C.C.A.N. at 6624. In light of these unambiguous statements, it was error for the district court to rely on the service-of-process provision of the FSIA as circumstantial evidence that service of process on individuals entitled to diplomatic immunity would not violate international law.

 We also disagree with the district court's interpretation of the interplay between Articles 29 and 31 of the Vienna Convention. The district court reasoned that because Article 31 permits suit against—and, therefore, service of process upon—diplomats in certain limited circumstances, service of process does not violate the inviolability principle. See Tachiona I, 169 F.Supp.2d at 307. But this reasoning turns controlling precedent on its head. In 767 Third Avenue Associates, we explained that the inviolability principle "makes no provision for exceptions other than those set forth in Article 31." 988 F.2d at 298 (emphasis added). Accordingly, the fact that service of process is allowed in order to initiate the actions permitted by the express exceptions to inviolability does not mean that service of process on a diplomat is otherwise permissible under Article 29. If anything, that fact indicates that service of process on a diplomat in any action not specified in Article 31 would be improper; 767 Third Avenue Associates mandates that unless the Article 31 exceptions apply, the term "inviolable" must be accorded its fullest meaning, untempered by Article 31. Id. at 298–99.

In line with 767 Third Avenue Associates, the State Department forcefully argues that Article 29 of the Vienna Convention should be interpreted to preclude service of process on persons entitled to diplomatic immunity, even where such persons are served on behalf of a non-immune, private entity. See J.A. at 336–39 (letters from the State Department to the Department of Justice). Not only is the Government's interpretation entitled to "great weight," Sumitomo Shoji Am., 457 U.S. at 185, 102 S.Ct. 2374, but it is also supported by authority and sound reasoning.

"Personal inviolability is of all the privileges and immunities of missions and diplomats the oldest established and the most universally recognized." Satow's Guide to Diplomatic Practice 120 (Lord Gore–Booth ed., 5th ed.1979). It is "essential to ensure inviolability of the person of the ambassador in order to allow him to perform his functions without hindrance from the government of the receiving state, its officials and even private persons." Sen, A Diplomat's Handbook of International Law and Practice 107 (3d ed.1988); see also 767 Third Ave. Assocs., 988 F.2d at 298–99 (giving broad interpretation to the term "inviolab[le]").

It was with the foregoing considerations in mind that the District of Columbia Circuit ruled, in the Hellenic Lines case, that service of process on a diplomat as agent for a foreign government violated international law. See 345 F.2d at 980–81. The court noted four ways in which service of process might impair the performance of

diplomatic functions or otherwise impinge upon a diplomat's dignity. First, diplomats would feel "obliged to restrict [their] movements to avoid finding [themselves] in the presence of a process server." *Id.* at 980 n. 5 (quoting submission of State Department). Second, they would be diverted from their duties "by the need to devote time and attention to ascertaining the legal consequences" of the service of process. *Id.* Third, the manner in which process is served could be "publicly embarrassing." *Id.* at 981 n. 5. Finally, permitting service of process on foreign diplomats could be construed as a hostile act and, thus, could invite retaliatory practices in otherwise friendly countries. *Id.*

Plaintiffs seek to distinguish *Hellenic Lines* on the basis that, in that case, the plaintiff sought to serve process on a diplomat as an agent of a foreign government, not as an agent of a private, non-immune entity like ZANU–PF. Nothing in the D.C. Circuit's reasoning turned on the identity of the defendant, however. Rather, the court focused on the practical consequences of allowing service of process upon diplomatic agents, *see id.* at 980 n. 5, consequences that are equally likely to follow whether the diplomat (or the U.N. representative enjoying diplomatic immunity) is served as an agent for a private entity or as an agent for a foreign government.

Like the court in *Hellenic Lines*, we have no reason to doubt the Government's assertion that, as a practical matter, service of process on a person entitled to diplomatic immunity both interferes with that person's representative functions and constitutes an affront to his or her dignity. *See id.; see also* Vienna Convention, *supra*, 23 U.S.T. 3227, art. 29. In light of this court's own admonition that the inviolability principle be construed broadly, *see 767 Third Ave. Assocs.*, 988 F.2d at 298–

99, we hold that Article 29 of the Vienna Convention, as applied to Mugabe and Mudenge through Article IV, section 11(g) of the U.N. Convention on Privileges and Immunities, protected Mugabe and Mudenge from service of process as agents for ZANU–PF. Therefore, ZANU–PF was not properly served, and the claims against it should have been dismissed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is Affirmed in part, Reversed in part, and Remanded for entry of an order dismissing all remaining claims. Each party shall bear its own costs.