## In re AMERICAN INTERNATIONAL GROUP, INC. SECURITIES LITIGATION.

This Document Relates to:  All Actions.

No.  04 Civ. 8141(DAB).

United States District Court, S.D. New York.

Jan. 7, 2013.

---

David John Michalski, Hahn Loeser & Parks LLP, Cleveland, OH, Edward Labaton, Louis Gottlieb, Thomas A. Dubbs, Zachary Myles Ratzman, Labaton Sucharow, LLP, New York, NY, for Plaintiffs, Ohio Public Employees Retirement System, Public Employees Retirement Association of New Mexico, State Teachers Retirement System of Ohio, Ohio Police and Fire Pension Fund, Michael Feder, and Public Employees' Retirement System of Mississippi.

Samuel Howard Rudman, Robbins Geller Rudman & Dowd LLP, Melville, NY, Robert Andrew Skirnick, Meredith Cohen Greenfogel & Skirnick, New York, NY, for Plaintiffs, Public Employees Retirement Association of New Mexico, State Teachers Retirement System of Ohio, Ohio Police and Fire Pension Fund, Michael Feder, and Public Employees' Retirement System of Mississippi.

Gerald H. Silk, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, for Public Employees' Retirement System of Mississippi.

Deborah G. Solmor, Gregory S. Bailey, Ryan Stoll, Thoufiq Kutty, Andrew J. Jarzyna, Skadden, Arps, Slate, Meagher & Flom, LLP, Chicago, IL, Nicholas A. Gravante, Jr., Amy Lynn Neuhardt, Robert Jeffrey Dwyer, Steven Ian Froot, Boies, Schiller & Flexner, LLP, Cyrus Amir-Mokri, Douglas M. Kraus, George Abraham Zimmerman, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, David Scott Bassinson, Boies, Schiller & Flexner LLP, Albany, NY, for Defendants.

*MEMORANDUM AND ORDER*

DEBORAH A. BATTS, District Judge.

In 2004, Michael Feder filed a Complaint "on behalf of himself and all others

similarly situated" against American International Group, Inc. ("AIG"), Maurice Greenberg, Howard Smith, and Thomas Tizzio, which alleged violations of the Securities and Exchange Act of 1934. (Original Complaint, ECF No. 1). On February 4, 2004, the Court held a hearing on the consolidation of cases related to the Complaint and the determination of a lead plaintiff to represent that class in the matter. On February 8, 2004, the Court issued two Orders, which consolidated the cases and named the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, and the Ohio Police & Fire Pension (collectively "Lead Plaintiff") representatives of the class. (Orders Appointing Lead Plaintiff, Approving the Selection of Lead Plaintiff's Counsel, and Consolidating. Cases, ECF No, 51, 52) The pending settlement in the suit against Maurice Greenberg, Howard Smith, Christian Milton, and Michael Castelli, and C.V. Starr & Co., Inc., Starr International Company, Inc. (collectively "Starr Defendants") is the final matter before the Court in this complex action, as the Court has already approved the settlements against co-defendants, PriceWaterhouseCoopers LLP (Final Judgment and Orders Approving Proposed Settlement, Attorneys Fees, Expenses, and Plan of Allocation, ECF No. 568–573) and AIG (Final Judgment and Orders Approving Proposed Settlement, Attorneys Fees, Expenses, and Plan of Allocation, ECF No. 619–622). In advance of the Court holding a Fairness Hearing and giving final approval to the Settlement in the instant action ("Settlement"), the State of New York Office of the Attorney General ("NYAG") filed an objection. The NYAG asserted that the Settlement was unfair and inadequate because it does not take into account an alleged fraudulent transaction involving the General Reinsurance Corp. ("Gen Re"), the occurrence of which

is, in large part, the basis of a suit that the NYAG is prosecuting in state court. The issue before the Court is whether the NYAG has standing to object to the Settlement in this matter. The NYAG requests that, in the event that the Court find it lacks standing, the Court grant it leave to move to intervene, specifically to raise an objection to the Settlement. For the reasons stated *infra*, the Court finds that the NYAG lacks standing to object, and the NYAG's Request for Intervention is DENIED.

## BACKGROUND

The Parties' familiarity with the facts of this case is assumed, and the Court reiterates only those relevant for the resolution of the narrow matter before it. In October 2004, the instant securities class action suit was filed in this Court. (Original Complaint, ECF No. 1) In February 2005, Congress passed, and the President signed, the Class Action Fairness Act of 2005 ("CAFA" or "the Act"). Lead Plaintiff filed an Amended Complaint in April 2005. (Consolidated Amended Class Complaint, ECF No. 61) In January 2011, Lead Plaintiff and Starr Defendants sought preliminary approval of the Settlement. (Lead Plaintiff's Motion for Preliminary Approval of Class Settlement, ECF No. 574) Also as early as January 2011, the NYAG began submitting letters to the Court, making known its belief that the Settlement should be delayed. While there is some disagreement among the Parties and the NYAG, the Court believes that between January 2011 and now, there were a series of requests from the NYAG to the Parties for documents, meetings, and cooperation related to the Settlement. (*See; e.g.,* NYAG Bit. at 2, n. 2; Lead Pl's Br. at 3–5) Also during this time, the NYAG made clear to Lead Plaintiff and Starr Defendants its intention to object to approval of the Settlement.

This Court preliminarily approved the Settlement in an Order issued on February 3, 2012, which defined the Settlement Class as:

all persons and entities who purchased or otherwise acquired AIG Securities during the period of time from October 28, 1999 through April 1, 2005, inclusive (the "Class Period"), as well as all persons and entities who held the common stock of HSB Group, Inc. ("HSB") at the time HSB was acquired by American International Group, Inc. ("AIG") in a stock for stock transaction, and all persons and entities who held the common stock of American General Corporation ("AGC") at the time AGC was acquired by AIG in a stock for stock transaction, and were damaged thereby.

(Preliminary Approval Order, ECF No. 623) The February 3, 2012 Order also included a Notice of Proposed Settlement, which provided members of the Settlement Class the option to exclude themselves from the Settlement while preserving their rights pursue their individual claims against the Starr Defendants. (*Id.*) The period to object closed, and there are no outstanding objections by members of the class.

The NYAG, which is pursuing its own suit against the Starr Defendants in state court, submitted its objection to the Court on August 17, 2012. The NYAG's objection is based primarily on an expert's error made during the loss causation calculations, arguing that a certain transaction between AIG and Gen Re had a negative effect on value of the shareholders' equity on specific dates. (NYAG Objection at 8–10) In *People v. Greenberg, et al.*, Index No. 401720/05 (N.Y.Sup.Ct.), the State Ac-

tion against the Starr Defendants based on the Martin Act and New York Executive Law ("State Action"), the NYAG alleges that there was a market fallout from the AIG–Gen Re transaction, and claims over $6 billion in damages.[1] (NYAG's Br. at 1–2, 9) The NYAG believes that the Settlement, then, is inadequate, and does not take into account the decline in AIG stock value resulting from three alleged "Corrective Dates"—days on which the market would have absorbed fully, and reacted to, the negative information surrounding the transaction.

Lead Plaintiff filed a reply to the NYAG objection on September 19, 2012, and the Starr Defendants, on September 20, 2012. Lead Plaintiff does not deny the error, but asserts that it would not have affected the settlement.

The NYAG is neither a member of the Settlement Class nor a representative of any member, but insists that it has standing to protect the marketplace, as well as the interests of the state residents who have been affected.

## DISCUSSION

The NYAG argues that it "clearly has standing to object to the Starr Settlement under both [CAFA] and traditional standing principles." (NYAG Br. at 2) In support, the NYAG declares that (1) CAFA established standing for State Attorneys General to object to class action settlements, and the Act applies to suits filed prior to its enactment, (2) it has independent standing under other legal principles, and, in the alternative, (3) it meets the criteria to intervene in this matter. The Court discusses the NYAG's arguments in turn, but finds them to be unpersuasive.

---

**1.** Though the NYAG claims damages amounting to approximately $6.557 billion (NYAG Br. at 9), it notes that in *U.S. v. Ferguson*, 584 F.Supp.2d 447 (D.Conn.2008), a related criminal case, the judge found the loss from the transaction to have cost at least $544 million, a difference of more than $6 billion. (*Id.* at 10, n. 9)

## I. Objecting to a Settlement Pursuant to Rule 23

Rule 23 provides that [a]ny *class member* may object to the propos[ed settlement, voluntary dismissal, or compromise] if it requires court approval...." Fed. R. Civ. P. 23(e)(5)(emphasis added). From the unambiguous description of the Settlement Class set out in the February 3, 2012 Order, it is clear that the NYAG is not a member of the class. Nor does the NYAG claim to be counsel of record for any members of the Settlement Class. "Because [the NYAG] is not a class member, it does not have an affected interest in the class Plaintiffs' claims against [the Starr Defendants] to be able to assert its objections...." *Central States S.E. & S.W. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir.2007). It is therefore uncontested that the NYAG does not have standing under Rule 23 to object to the Settlement. (*See also* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 13:69 (4th ed. 2002)("Nonparties to a settlement generally do not have standing to object to a settlement of a class action."))

## II. The Class Action Fairness Act of 2005

congress passed the Class Action Fairness Act or 2005 ("CAFA" or "the Act") in February 2005 to, *inter alia,* "amend the procedures that apply to consideration of interstate class actions to assure fairer outcomes for class members and defendants...." Class Action Fairness Act of 1995, Pub.L. No. 109–2, 119 Stat. 4. The President signed the Act into law on February 18, 2005. CAFA's notice provision demands that settling defendants provide the State Attorneys General from each state with residents in the class, "a notice of the proposed settlement consisting of a copy of the complaint and any materials filed" therewith "[n]ot later than 10 days after a proposed settlement of a class action is filed in court...." 28 U.S.C. § 1715(b)(1). It further demands that defendants serve said Attorneys General with "notice of any scheduled judicial hearing in the class action, any proposed or final notification to class members, any proposed or final class action settlement," 28 U.S.C. § 1715(b)(2)-(4), and "any final judgment or notice of dismissal." 28 U.S.C. § 1715(b)(6). The presiding Court, furthermore, is not permitted to "issue[ a final approval of a proposed settlement] earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b)." 28 U.S.C. § 1715(d), The law was drafted carefully, advising parties and courts of its reach and limitations by declaring that "[n]othing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials." 28 U.S.C. § 1715(f).

### A. CAFA's Application to the Instant Action

Despite its concession that CAFA was enacted subsequent to the commencement of the instant suit, the NYAG contends that the Act still applies and provides it with standing to object here. In support of this contention, the NYAG offers three arguments. The Court finds that the NYAG's arguments are without merit.

The NYAG first argues that the outcome in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), which highlighted the distinction between procedure and substance, requires this Court to hold that suits pending during CAFA's enactment are affected by any procedural changes made by the law. Procedural changes established by

CAFA, such as the Act's notice requirement, would have taken effect upon the law's enactment, and would provide such authorities standing to object to a settlement even in a pending case. (*See* NYAG Br. at 5) The problem, however, is that this argument relies on an axiom that is in direct conflict with another axiom, and, in this instance/ the one on which the NYAG relies is the weaker. While the Supreme Court has held that "first is the rule that 'a court is to apply the law in effect at the time it renders its decision,' " *Landgraf,* 511 U.S. at 264, 114 S.Ct. 1483 (citing *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)), it has also held that " 'congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.' " *Landgraf,* 511 U.S. at 264, 114 S.Ct. 1483 (citing *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)).[2]

■ Here, the law states that "[t]he amendments made by [it] shall apply to any civil action commenced on or after the date of enactment." Pub.L. No. 109–2, 119 Stat. 14. The plain language of the statute makes clear "that the ... Act does not evince any clear expression of intent on [it's] application to cases arising before the Act's enactment.' " *Landgraf,* 511 U.S. at 264, 114 S.Ct. 1483. (*See also Blockbuster, Inc. v. Galeno,* 472 F.3d 53, 56 (2d Cir. 2006)).

Next, the NYAG argues that "the prospectivity applies only to CAFA's expansion of existing federal removal and diversity jurisdiction provisions[,]" but "not the notice provisions," because the effective date applies only to amendments to existing law. (NYAG Br. at 5) The argument that CAFA, the law aimed at reforming class actions generally, was intended to be severed for the purposes of its effective date is without merit. That Congress wrote CAFA to be interpreted as having "amended" existing federal law vis-à-vis one procedural change, and "created" new laws when it made other procedural changes, is specious and unsupported. (NYAG Br. at 5) "Amendments" much more likely refers to the Act's overall changes to the United States Code, and this obviates reading an inconsistency into the Act by which Section 3 would have an effective date distinct from that of Sections 4 and 5. The Court, therefore, reads the statute to reflect as much. (*See* Pub.L. No. 109–2, § 3(a)("Part V [i.e. Title 28 of the United States Code] is amended by inserting after chapter 113 the following. . . ."))[3]

Finally, the NYAG argues that for the purposes of "the operative date of Lead Plaintiff's complaint[,]" the Court should look to "the filing [date] of the Third Amended Complaint[,] April 19, 2005." (NYAG Br. at 6) This date, when the Gen Re fraud allegations were added, "is after the effective date for CAFA of February 18, 2005." (*Id.*) As such, the NYAG con-

---

**2.** The Court in *Landgraf,* furthermore, distinguished the issue before it from that in another case where it "found it unnecessary ... to resolve th[e] seeming conflict 'because under either view, where the congressional intent is clear, it governs. . . .' " *Landgraf,* 511 U.S. at 264, 114 S.Ct. 1483 (citing *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 837–838, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990)).

**3.** Also, had Congress intended to compare and contrast potential effective dates, it could have noted this specifically, as it did in Section 7 of the Act, regarding Judicial Conference Recommendations, which states "[n]otwithstanding any other provision of law, the amendments to rule 23 ... shall take effect on the date of enactment of this Act or on December 1, 2003 ..., whichever comes first. Pub.L. No. 109–2 § 7.

cludes, the Complaint, at least to the extent that the Gen Re allegations are involved, should not be deemed to "relate back" to the original filing date, and the NYAG should have standing to object. Courts typically analyze whether allegations relate back in actions where a case is removed from state court and/or where a statute of limitations may preclude Parties from asserting new claims or defenses. Neither situation is before the Court, as the case was initially filed here, and no party is contesting whether a statute of limitations applies.

■ Generally, "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed.R.Civ.P. 15(c)(1)(B). "If facts provable under the amended complaint arose out of the conduct alleged in the original complaint, relation back is mandatory." *Slayton v. American Express Co.*, 460 F.3d 215, 227 (2d Cir.2006). But, where the complaint is "based on an 'entirely distinct set' of factual allegations [it] will not relate back." (*Id.* at 228) When making this inquiry, the Court must remain mindful that "[t]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." (*Id.*)(citing *Siegel v. Converters Transportation, Inc.*, 714 F.2d 213, 216 (2d Cir.1983))(internal quotations omitted). So, determining whether the allegations in an amended complaint relate back is a question of "whether adequate notice of the matters raised in the amended pleading has been given to the opposing party. . . ." (*Id.*)(quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir.1999)).

After a brief mention of the Gen Re allegations, the NYAG concludes that the Third Amended Complaint in this case "stated entirely new facts," (NYAG Br. at 6), and, therefore, the claims therein should be held not to relate back to the Original Complaint. The Court finds to the contrary. The instant case is a very complex action, which started with an "initial complaint alleg[ing] a 'basic scheme' of defrauding investors by misrepresenting earnings and profitability." *Slayton*, 460 F.3d at 228 (quoting *In re Chaus Securities Litigation*, 801 F.Supp. 1257, 1264 (S.D.N.Y.1992)). Though much of the investigation into the Gen Re transaction began in late 2004 and early 2005, the ensuing allegations are just another component of the scheme alleged initially, whereby AIG "overstate[d] its earnings during the Class Period." (Compl. at 19) The allegation "[t] hat AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities, including the General Re transaction[,]" (Am. Compl. at 111), is an extension of the allegations that the company inflated "First Quarter 2001 Income," and "violated the 1934 [Securities and Exchange] Act [ ] omitted and/or misrepresented material facts . . . disregarded that their statements were false [,] and artificially inflated that prices of AIG's publicly traded securities[.]" (Compl. at 11, 23) The alleged acts are the bases on which Lead Plaintiff asserts violations of Sections 10(b) and 20(a) of the Securities and Exchange Act. Where a plaintiff files for leave to amend a complaint, and all Parties have reasonable notice of what is being alleged in an admittedly large scheme, adding further allegations of the complained of fraud in violation of the same statutes does not impact the suit. Therefore the "amended com-

plaint will relate back because it is a 'natural offshoot' of that scheme." *Slayton,* 460 F.3d at 228 (quoting *In re Chaus Securities Litigation,* 801 F.Supp. 1257, 1264 (S.D.N.Y.1992)),

Furthermore, in a case involving the Private Securities Litigation Reform Act of 1996 ("PSLRA"), a similarly-styled litigation reform law, the Second Circuit found that an Amended Complaint related back to the filing of the Original Complaint. *Gerber v. MTC Electronic Technologies, Ltd.,* 329 F.3d 297 (2d Cir.2003). The Court held that the "statutory language refers to 'actions,' not to 'claims.'" *Gerber,* 329 F.3d at 309–310. In this regard, CAFA and PSLRA have comparable wording, as CAFA states "[t]he amendments made by this Act shall apply to any civil *action* commenced on or after the date of enactment of this Act." Pub.L. No. 109–2, 119 Stat. 4 (emphasis added). This Court, like the Court in *Gerber,* finds that "the 'action' here was commenced when the complaint was filed[,]" in October 2004. *Gerber,* 329 F.3d at 310 (referencing Fed. R.Civ.P. 3).

While the NYAG cites cases to demonstrate that "State Attorneys General routinely object to class action settlements they believe to be inadequate or unfair[,]" each case cited postdates CAFA's enactment. (NYAG Br. at 3)(*See also infra* at 462.)

CAFA, then, does not apply to the instant case, as it was passed months after the suit commenced.

## B. New Standing Authority Under CAFA

■ Even were CAFA to apply here, the Court finds that CAFA's provisions create no new standing authority that would empower the NYAG to file its concerns to the Settlement Objector.[4] That CAFA does not affect standing is clear from the plain text, which states that "[n]othing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials." 28 U.S.C. § 1715(f). Indeed, each case that the NYAG cites on this point involves the NYAG's counterparts objecting by filing only *amicus curiae* briefs, not as an Objector. (NYAG Br. at 3)[5]

Expanding the standing doctrine without clear statutory authority, instead of interpreting the "normal course of the class action settlement procedures" to mean extant procedures,[6] would undermine any notion that CAFA "is a modest attempt" at class action reform. S.Rep. No. 109–14 at 27. The Court, therefore, declines to take such an expansive reading of the Act. (*See also, In re: Buderprion XL Marketing & Sales Litigation,* 2012 WL 4322012, 2012 U.S. Dist. LEXIS 135313 (E.D.Pa.2012))(Though it "affords states a right to be notified of class action settlements[,]" CAFA "says nothing, however, of granting states a right to be heard on, or formally appeal, every class action

---

**4.** In the antitrust context, a court has held "[b]ecause it is not a member of the class and lacks standing to object, the Government submits 'comments' on the Settlement." *In re Currency Conversion Fee Antitrust Litigation,* 263 F.R.D. 110, 125 (S.D.N.Y.2009).

**5.** Pursuant to *U.S. v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968 (2d Cir.1984), the Court has discretion to permit the NYAG to appear as *amicus curiae* in lieu of interven-

tion, and it elects to use this authority. Accordingly, the Court will consider the NYAG objection and past submissions as *amicus curiae* submissions.

**6.** The Court notes that, should Congress have seen the need for them, it could have made explicit changes to the standing doctrine in class action litigation, or at least explored them, during the course of the bill's debate.

settlement simply because residents of that state are class members.")

### III. "Independent" Grounds for Standing to Object

■ It is well-established that constitutional standing requires one to show (1) "injury in fact," "an invasion of a legally protected interest" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood, "as opposed to mere[ ] speculat[ion], that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted). On these basic grounds, the NYAG does not present the Court with an adequate basis for standing. A decision by this Court to proceed with the Settlement is an insufficient claim of injury to the NYAG and the State of New York. It is speculative, furthermore, to conclude that the NYAG will ultimately succeed on its claims in state court. In 2008, four Gen Re executives were convicted on federal criminal charges with respect to the Gen Re transaction; but those convictions were reversed and remanded for a new trial. (*See U.S. v. Ferguson,* 553 F.Supp.2d 145 (D.Conn. 2008)) In the State Action, "[d]iscovery has been fought out in 39 different motions, millions of pages of documents were produced and over 50 witnesses deposed." (NYAG Objection at 7) Notably, the trial Court's denial of Cross–Motions for Summary Judgment on Gen Re's liability was affirmed by the Appellate Division. *People v. Greenberg,* 95 A.D.3d 474, 946 N.Y.S.2d 1 (N.Y.App. Div. 1st Dep't 2012). The trial court's Order, to the extent that it partially granted the NYAG's Summary Judgment Motion, was reversed, as the Court found "that the record evidence … presents triable issues of fact as to whether defendants knew of, or participated in the fraudulent aspects of the Gen Re and CAPCO schemes, given the nature and degree of their personal involvement in both of the challenged transactions, as well as defendants' responsibilities within the corporation." (*Id.* at 484, 946 N.Y.S.2d 1) As of January 7, 2013, Defendants' Summary Judgment denials are pending before the New York Court of Appeals. (NYAG Br. at 8)

■ In addition, courts have articulated prudential requirements, or non-constitutional bases for restrictions on standing. At the crux of the prudential standing doctrine, the Supreme Court has expressed the belief that, in general, Parties are better served when they litigate their own disputes; they assert interests that they wish to have redressed and the quality of the litigation is improved. *See, generally, Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). These very same principles underlie the development of the procedure for class action litigation, and are the reason why class action suits, like the one here, provide notice to the members with a mechanism for remaining a party to the litigation or pursuing their claims individually. (Preliminary Approval Order at 16, 41, 84, Notice of Proposed Settlement, Ex. 1, ECF No. 623) Fed.R.Civ.P. 23(c)(2)(v)-(vii). The prudential standing principles militate against the NYAG here.

And, while it is generally recognized that states can have standing when, for example, they are defending the constitutionality of their own laws, *see, e.g., Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), or contesting a federal agency's limitation of grants to them, *see, e.g., New York v. Heckler,* 719

F.2d 1191 (2d Cir.1983), the NYAG does not argue either of these as the basis for it to have standing here. Nor does the NYAG assert that the state's residents are being excluded from benefits in the federal suit. *See, generally, Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Instead, the NYAG asserts standing on behalf of New Yorkers who fall within the definition of the class, predicated on its "broad and exclusive authority to enforce the Martin Act" and mandate "to maintain the integrity of the marketplace and protect the public from securities frauds and business frauds." (NYAG Br. at 7) In this case, however, class counsel is seeking remedy for alleged violations of *federal* securities laws that have injured the class, which includes the New Yorkers whom the NYAG seeks to protect. It is not infrequent that parallel suits are litigated, and not unthinkable that there might be overlap between class members in a federal suit and state residents who provide the basis for pursuing state claims. There is no recognition of standing simply to delay or stall federal litigation in which one has no direct interest.

In support of its argument for independent standing, furthermore, the NYAG analogizes its situation with *Tachiona v. United States*, 386 F.3d 205 (2d Cir.2004).[7] Aside from CAFA (which, as noted *supra*, does not grant standing), the NYAG relies on no statute to demonstrate its federally recognizable interest in the case and, thus, cannot rely on that parallel to support its argument for independent standing. The NYAG, unlike the Government in *Tachiona*, has never been a party in this case. Finally, the NYAG's most forceful argument, both on the question of standing currently before the Court and in support of its objection to the Settlement generally, is that final approval of the Settlement will preclude it from pursuing its case against the Starr Defendants, which is currently pending in state court. This Court need not opine on whether *People by Spitzer v. Applied Card Systems, Inc.*, 894 N.E.2d 1, 11 N.Y.3d 105, 863 N.Y.S.2d 615 (N.Y.2008) would frustrate NYAG's ability to prosecute its case against the Starr Defendants. It is noteworthy, however, that in *Tachiona*, the lower Court's ruling on the standing issue was being questioned insofar as it impacted the litigation before that very same Court. Here, the NYAG seeks a favorable ruling on a standing issue before this Court because a nonfavorable one may impact an entirely different suit. Clearly, the interests to be considered in this analysis are quite different from those in *Tachiona*, but the assertion that the "NYAG's interest in this action is equal to, if not greater than, the governmental interest demonstrated in the *Tachiona* case" is not supported by the facts in either case. (NYAG Br. at 8)

## IV. Mandatory and Permissive Intervention Under Rule 24

■ In a footnote to its letter brief, the NYAG asserts that "[i]f the Court never-

---

**7.** In *Tachiona*, the Department of Justice "filed a 'suggestion of immunity,'" (*id.* at 209), in accordance with a federal statute that permits the U.S. Attorney General dispatch a member of his agency "to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517. The Government's interest in that case, the safeguard of executive branch's power to regulate foreign affairs, rose to a constitutional level. The question not only demanded an analysis of the potential for a lower Court Order to frustrate U.S. obligations under important treaties, but also required a careful discussion of the executive branch's authority to conduct foreign relations. In that case, even further, the Government was formally a party to the suit as a result of the lower Court's grant of its Motion to Intervene.

theless concludes that the NYAG lacks standing to object, the NYAG would seek leave to intervene for the limited purposes of objecting to the Starr Settlement." (NYAG Br. at 2, n. 1) The rules and process for intervention, both of right and by Court permission, are set forth in Rule 24. Fed.R.Civ.P. 24. On intervention as of right, one "is given an unconditional right to intervene by a federal statute" or when one has "an interest relating to the property or transaction that is the subject of the action," and "disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, *unless* existing Parties adequately represent that interest." Fed.R.Civ.P. 24(a)(emphasis added). The NYAG does not meet the threshold requirements for intervention as of right in this case because (1) there is no statutory basis for intervention,[8] (2) the NYAG does not demonstrate sufficiently a legal interest at stake, and, at a minimum, (3) there has been no showing that the class members, including those on whose behalf the NYAG seeks to interject itself, are not adequately represented.

■ Permissive intervention may be granted, "[o]n timely motion[,]" to a "government officer or agency . . . if a party's claim or defense is based on a statute or executive order administered by the officer agency" as well as "any regulation, order, requirement, or agreement issued or made under the statute or executive order." Fed.R.Civ.P. 24(b)(2). *See also Yniguez v. Arizona*, 939 F.2d 727 (9th Cir.1991) (The law allows state Attorneys General to intervene when the constitutionality of a state law is at issue in federal court, and, still, there is no unlimited right to intervene.). Again, the Court finds that there is no statutory basis for intervention here, nor does the NYAG persuade the Court that there is an adequate basis in any other authority.

Finally, Rule 24 notes that "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original Parties' rights." Fed. R. Civ. p. 24(b)(3). This alone is sufficient to reject any request for intervention. The NYAG's argument is that, after eight years of litigation, the settlement here should be halted or further delayed so that the NYAG may prosecute its case. The Court, however, finds that it is in the interest of the Settlement Class to have this matter resolved and, therefore, cannot agree that further protraction is correct, just, or otherwise warranted.

This Circuit held in *Dunlop v. Pan Am. World Airways, Inc.,* that the District Court erred in not granting a Rule 60 Motion made by non-parties to the suit, but that case is factually distinguishable from the present one. *Dunlop v. Pan Am. World Airways Inc.,* 672 F.2d 1044 (2d Cir.1982). In *Dunlop,* nonparties to the federal action had previously commenced their own age discrimination suit against a common defendant, but the action was stayed while the parallel federal suit proceeded. (*Id.* at 1047) The federal suit settled but, under the terms of the settlement, only a percentage of those injured were granted damages. (*Id.* at 1047–48) The language releasing the defendants from liability defined a class of those who would no longer be able to sue; this included the Appellants, who had been part of the initial state suit, but not awarded damages as a part of the federal settle-

---

8. The NYAG claims authority in the State Action, and ostensibly here, based on the Martin Act and other state law. Undoubtedly, these authorities are not based in federal statute and, therefore, do not support intervention in federal securities litigation, particularly where parties are represented by competent counsel.

ment. (*Id.*) In *Dunlop*, then, there was no ability for the Appellants to opt out of the federal action, even though they were among many who had a cognizable claim and suffered personal injury but, by the terms of a settlement negotiated by the federal government, were not provided a remedy and were being estopped from going forth with their own claims in state court. (*Id.*)

Here, however, the NYAG is suing Defendants on state claims, and its suit proceeds contemporaneously with the federal private action. Were this lawsuit terminated through the Settlement, the release would not exclude any group of class members from the Settlement. Pursuant to the Agreement, members would either be part of the group eligible for an award of damages, or they could have opted out with the option of pursuing an action for their individual claims. (Preliminary Approval Order at 16, 41, 48, Notice of Proposed Settlement, Ex. 1, ECF No. 623)

The Settlement Agreement in the instant action explains the rights of the Settlement Class with respect to the State Action, whereas the release in *Dunlop* was less clear on this point. In the Contingent Agreement of Compromise and Settlement, the Parties stated that "even if this settlement is approved by the Court, and in connection with th[e] ongoing litigation [in the State Action], the New York Attorney General may seek whatever remedies are permitted by law." (Declaration of Thomas A. Dubbs, Contingent Agreement of Compromise and Settlement at 28, Ex. 3, ECF No. 576) The Preliminary Approval Order notes that "[t]he Starr Released Claims in this Settlement may include damages claims originally asserted . . . in an action in New York state court captioned *People v. Greenberg*, Civ. No. 401720 (N.Y.Sup.Ct.)" and, in bolded print, it states "Your Participation in This Settle-

ment Could Result in the Loss of Damages Claims Brought on Your Behalf in the NYAG Action." (Preliminary Approval Order at 23, Notice of Proposed Settlement, Ex. 1, ECF No. 623) In this case, the members of the Settlement Class are afforded clear notice that the Settlement may foreclose their rights in the State Action. In *Dunlop*, the release did not specify what legal recourse, if any, would be available to the Appellants who were not awarded damages as a part of the settlement. In *Dunlop*, the Court said that though it "would not ordinarily be available to non-Parties to modify final judgments, we hold that on the facts of this case appellants were sufficiently connected and identified with the Secretary's suit to entitle [the individuals not awarded damages but still precluded from litigating their claims] to standing," and, in the alternative, the "Secretary's amicus brief to the court below may properly be construed as a motion to amend [the judgment and release] by the Secretary, who clearly has standing to make such a motion," *Dunlop*, 672 F.2d at 1052–053. There is no comparable situation here, but, to the extent that Rule 60 as analyzed in *Dunlop* presents an analogy to the instant matter, the Court finds that the NYAG falls within the general rule (i.e. remedy not ordinarily available). The Court, therefore, concludes that intervention is not appropriate in this case.

## V. Substantive Grounds for NYAG Opposition to the Settlement

In substance, the NYAG's *amicus curiae* brief makes two general arguments against the Settlement. First, the NYAG argues that the Class Notice is defective for having made a misrepresentation of a material statement (i.e. that Lead Plaintiff's expert determined there is no statistical significance of the lost value in AIG stock on the Corrective Dates). Second,

the NYAG asserts that the Parties failed to consider the Corrective Dates in the course of settlement negotiations. The Court addresses each of the concerns raised.

In its reply to the NYAG's opposition to the Settlement, Lead Plaintiff concedes that there was a mathematical error made in the loss causation analysis of its expert Professor John Finnerty. (Lead Pl.'s Reply to NYAG Objection at 1) Pointing to the Notice to the Class, the NYAG says that the statement was based on the error, and therefore there was a material defect in the Notice, The Notice of Proposed Settlement states:

> Lead Plaintiff's loss causation expert has also examined the movements in AIG's stock price on the three alleged disclosure dates and *has determined that none of them is statistically significant,* i.e., there may be no legal basis on which to award any damages for the stock drops on those dates.

(Preliminary Approval Order at 24, Notice of Proposed Settlement, Ex. 1, ECF No. 623)(emphasis added) The NYAG urges the Court to, at a minimum, order the issuance of a corrected Notice. Lead Plaintiff concedes as much, (Lead Pl.'s Re-

ply to NYAG Objection at 2), and with its reply to the NYAG opposition brief, Lead Plaintiff includes Exhibit Q, a Proposed Supplemental Notice,[9] which states that Professor Finnerty has retracted his conclusion about the lack of statistical significance of the three dates. (Lead Pl.'s Reply to NYAG's Objection, Ex. Q) The Court concludes that it is in the interest of the Settlement Class to have a Supplemental Notice sent out, and endorses the Supplemental Notice of Proposed Settlement and Fairness Hearing, which was submitted as Exhibit Q to Lead Plaintiff's reply to the NYAG's August 17, 2012 objection to the Settlement, as amended by the Court.[10] The Court finds that the Supplemental Notice, as amended by the Court, will provide due notice to the class and give its members adequate opportunity to respond to the correction.

■ The NYAG's second argument is that the statistical significance of the Corrective Dates should have been, but was not, taken into account in Lead Plaintiff's and the Starr Defendants' settlement discussions. On three dates the market recalibrated in response to the fallout from the Gen Re transaction, the NYAG argues,

---

9. Lead Plaintiff notes that, though it offered the NYAG numerous opportunities to take part in the phrasing of the Notice, the NYAG has largely ignored their offer to participate. (Lead Pl's Br. at 3–5)

10. The box on the final page of the Supplemental Notice of Proposed Settlement and Fairness Hearing should read as follows: (1) SUBMIT A CLAIM FORM BY ____. The way to get a payment. However, if you already submitted a claim form in the PwC Settlement, you do not have to do so again. Instead, you must complete a Release Form. If you already submitted a claim form or Release Form in response to the Notice, you do not have to do so again. (2) EXCLUDE YOURSELF BY ____. Get no payment and remove yourself from the Settlement Class. This is the only option that allows you to ever

bring or be part of any *other* lawsuit against the Starr Defendants and other "Starr Released Persons" about the "Starr Released Claims" (including the State Action). *Even if you have signed a claim form and a Release Form prior to the issuance of this updated Notice, and you wish to exclude yourself now, you may do so.* (3) OBJECT BY ____. Write to the Court about why you do not like the Settlement. If you submit a claim form prior to ____. You will still be a member of the Settlement Class. (4) GO TO A HEARING ON ____. Ask to speak in Court about the Settlement at the Fairness Hearing. (5) DO NOTHING. If you did not already submit a claim form or Release Form in connection with this Settlement, you will get no payment and give up your rights.

and it estimates AIG stock loss to shareholders attributed to those dates is an estimated $6.5 billion. (NYAG Objection at 9) To remedy this, the NYAG asks this Court to (1) stay the settlement proceedings pending the outcome of the litigation in the State Action (*See, e.g.,* Letter from NYAG (Jan. 25, 2011); Letter from NYAG (July 13, 2011)); (2) send Parties back to the bargaining table to renegotiate a settlement amount that reflects the damages from the transactions (NYAG Objection at 10); or (3) "carve out" from the Settlement any liability based on the three dates related to the Gen Re transaction. (NYAG Br. at 3, n. 3) The Court finds none of these courses of action are appropriate at this stage.

First the NYAG requests a stay pending the disposition of the State action. In its first letter to the Court on this matter, the NYAG said "that the remaining issues are set to go to trial on May 2, 2011." (Letter from NYAG, Jan. 25, 2011). Now, more than a year and a half later, the State Action is not resolved. Given the uncertain length of the State Action, the Court finds that the time table for its resolution might be enough to reject any further delay, much less awaiting its complete resolution. Even more, the disposition, which may be in favor of either the NYAG or the Starr Defendants, is not certain, and therefore may add little or no value to the instant Settlement.

The NYAG's plea for the Court to send Parties to commence entirely new negotiations not only raises the concern of undue delay, but it would also demand that the Court mandate action based on sheer speculation and hotly contested expert evaluations. Over the course of the time when it became clear that the NYAG would object, various expert projections and arguments as to the amount of damages attributable to the Gen Re transaction have been floated, including nothing, $100 million, $543 million, $1.2 billion, and $6.5 billion. The NYAG's expert estimated damages on the highest end of the spectrum, and the NYAG believes that due to the Finnerty error, Parties negotiated without full consideration of the damages at stake. But Lead Plaintiff notes that it retained Dr. Finnerty as a "testifying witness on loss causation and related issues at the class certification stage[,]" not for the purposes of "perform[ing] any damage analysis" for settlement negotiations. (Lead Pl.'s Reply to NYAG Objection at 8). Furthermore, Lead Plaintiff's damage analysis expert, Mr. Frank Torcio, still finds that "none of the Questioned Dates are statistically significant at the 95% confidence level." (Lead Pl.'s Reply to NYAG's Objection, Ex. J (Torcio Dec.)) In a separate declaration, another expert noted that "Professor Finnerty's error is not material and should not affect the amount or reasonableness of the settlement." (Lead Pl.'s Reply to NYAG's Objection, Ex. L (Fischel Dec.)) [11]

11. Fischel's declaration presents a comparison of the statistical significance of the Gen Re transaction disclosure dates when considered in light of differing estimation periods-before the class period, during the class period, after the class period, and before and after class period. His evaluation matrix demonstrates no statistical significance to the price movements on the Questioned Dates in half of the instances. (*Id.*) He asserts that Nattesheim's analysis was used for the State Action case, based on a belief that the three dates "were the only relevant disclosure dates[,]" and consequently uses a narrower window for her estimation period. (*Id.*) Here, however, the use of a one-year period is inapt, but it is more suitable to consider "disclosures throughout the class period, which runs from October 28, 1999 through April 1, 2005." (*Id.*) Thus, he concludes, "[t]here is no reason to believe that an estimation period based on one of the least important disclosure dates in this case is appropriate for all the disclosures in this case." (*Id.*)

The NYAG argues, still, that "even if there is only a 10% chance of recovering" on the State Action claims, the amount retrievable would be "considerable." (NYAG Objection at 18).

Where there are conflicting opinions from experts as there are here, the Court need not partake in a back-and-forth prior to approving a settlement, but can proceed on the reasonably certain factors with which it is presented. *In re Milken and Associates Securities Litigation*, 150 F.R.D. 46, 53–54 (S.D.N.Y.1993) ("[V]ictory—even at the trial stage—is not a guarantee of ultimate success," and "given the number of defendants and the complexity of the issues [and that] appeals are a distinct possibility ... [t]he aspect of resulting delay and uncertainty favors settlement at this juncture," particularly because "the view of experienced counsel favoring the settlement is 'entitled to a great weight.' ")(internal citation omitted). Furthermore, this Court will not speculate whether or not the proceedings in the State Action would have strengthened Lead Plaintiff's bargaining power. Lead Plaintiff notes that "[t]his Action is far broader than the State Action," and it takes into account "the Gen Re and CAPCO Transactions" as well as "claims based on dozens of other allegedly fraudulent transactions...." (Lead Pl.'s Reply to NYAG Objection at 6). As a result, Lead Plaintiff asserts that it has taken an "approach" to a settlement strategy "based on all of the transactions ... rather than limiting it to a few...." (*Id.* at 7). The Court will not second-guess this approach based on the questionable assertions of a nonparty.

Similarly, the Court finds that "carving out" the Gen Re claims from the Settlement Agreement's release of liability would be improvident as it would all but frustrate the Settlement with no sound basis to assume the Class would fare better. The Parties know that "[t]he settlement period includes the entire time period from the date on which the Gen Re Transaction was first reflected on AIG's financial statements" and extends through the time when "all market moving information concerning the Gen Re Transaction ha[d] already been revealed." (Starr Def.'s Reply to NYAG Objection at 20). Though the NYAG contends that the Lead Plaintiff's loss causation analysis included a grave error that would have changed the approach and outcome of settlement talks, as noted *supra*, this is uncertain at best. Parties claim to have taken a holistic approach to settlement, and that they considered the relevant information that was available to them. This, combined with the many other factors discussed herein, convinces this Court that this case shall move forward.

Overall, the submissions on the damages amount in terms of the Settlement amount have not convinced the Court that the Settlement is insufficient. Any class action settlement must take into account a number of variables that may impact the parties' expected gains from foregoing trial, including settlement awards in comparable suits, the cost of delay, the value of potential verdicts in related suits, and changes in the bargaining position of the parties, among other factors.[12]

12. Lead Plaintiff has cited an article claiming that the NYAG sought a settlement with Greenberg estimated at $100 million (Letter from Lead Plaintiff at 3, n. 1 (Jan. 31, 2011)). (*See also* Charles Gasparino, *N.Y. AG Cuomo, Greenberg Hit Snag in Settlement Talks* (Sept. 5, 2008), http://www.cnbc.com/id/26564046/NY_AG_Cuomo_Greenberg_Hit_Snag_in_Settlement_Talks.) The NYAG, in tacit agreement with this claim, wrote "Plaintiffs' counsel points out that the [NYAG], in September 2008, agreed to a settlement [of] ... $115

CONCLUSION

For the reasons stated herein, the Court finds that the NYAG lacks standing to object to the Settlement. The Court finds, furthermore, that granting the NYAG leave to move to intervene is not appropriate. The Request to Intervene, therefore, is DENIED. The Court accepts the Supplemental Notice of Proposed Settlement and Fairness Hearing marked Exhibit Q in Lead Plaintiff's September 19, 2012 submission, with the amendments made thereto by the Court as noted in footnote 10 of this Order, and the Court Orders parties to see to the prompt issuance of the Supplemental Notice of Proposed Settlement and Fairness Hearing. Finally, the Court sets a Fairness Hearing, pursuant to Fed. R.Civ.P. 23(e)(2), for April 10, 2013 at 2:30 p.m. SO ORDERED.

million" but not that "Greenberg and Smith also agreed to those terms but within days refused to make the payment." (Letter from NYAG at 5 (Feb. 25, 2011)). What is significant here is that the NYAG was willing to settle its $6.1 billion case for $115 million.